UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re

RICHERT FUNDING, LLC, as                    Case No.:  6:18-bk-06276-KSJ
substantively consolidated with             Chapter 7
DWIGHT DONALD RICHERT and
HOLLY BERRY RICHERT

      Debtor(s).

_____/

BMO HARRIS BANK, N.A.

      Plaintiff,

v.                                          Adversary Proceeding
                                            Case No.:  6:19-ap-00260-KSJ
DWIGHT DONALD RICHERT,

      Defendant.

_____/

**PLAINTIFF BMO HARRIS BANK, N.A.'S RESPONSES TO DEFENDANT'S
STATEMENT OF MATERIAL FACTS IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff BMO Harris Bank, N.A. ("BMO") hereby responds to Defendant Dwight

Richert's ("Richert") Statement of Material Facts in Support of his Motion for Summary Judgment

and states as follows:

1

## I.   Pertinent Parties and Non-Parties.

### a.   Debtor

1.   Dwight Richert ("Debtor"), the debtor and defendant, is an individual and was the 100% owner of Richert Funding. Ex. 6. p. 228:24-25.

**RESPONSE:**  Admitted.[1]

### b.   Plaintiff- BMO

2.   BMO Harris Bank, N.A. ("BMO"), plaintiff in this adversary proceeding, is a global banking institution, one of the larger banks in the world serving personal, commercial, and affluent customers. Ex 3.

**RESPONSE:**  BMO denies that it is one of the largest banks in the world.  Exhibit 3 states that BMO is "one of the largest banks in the Midwest."  BMO otherwise admits Paragraph 2.

### c.   Richert Funding

3.   Richert Funding, LLC ("Richert Funding") was a Florida limited liability company, formed in or around April 2009 and owned 100% by Richert, with its principal place of business located in Windermere, Florida.

**RESPONSE:**  Admitted.

4.   Richert Funding was in the factoring business, which business involves the purchasing of accounts ("Accounts") from businesses (the "Factoring Clients"), the terms of which are generally contained in invoices. Ex. 6. p. 11:20- 23.

---

[1]      Richert's headings are not separately numbered and contain myriad legal arguments, characterizations, and erroneous statements.  To the extent that a response is required to these headings, BMO denies them for the reasons set forth herein.

2

**RESPONSE:** Admitted.

5.      Bart Garbrecht ("Garbrecht") was hired by Richert Funding in 2010 to develop new business. Ex. p. 15:15-16:2.

**RESPONSE:** Admitted.

### d.      ABL Farms

6.      A.B.L. Farms, Inc. ("ABL Farms") was a Florida corporation formed in or around September 2010, with its principal place of business in Live Oak, Florida. Aaron B. Letsinger ("ABL President" or "Aaron Letsinger") was the owner and president of ABL Farms. Jonathan "Danny" Letsinger ("VP ABL Farms" or "Danny Letsinger") managed ABL Farms and was acting as the Vice President of ABL Farms. (Wickman Deposition) Ex. _ p. 16:18-17:1. Aaron Letsinger and Danny Letsinger are brothers.

**RESPONSE:** Admitted.

7.      ABL Farms was in the business of brokering the sale of watermelons to customers. Ex. 1 p. 20:4-21:7.

**RESPONSE:** Admitted.

8.      Debtor was neither an owner, officer, director, or employee of ABL Farms. Richert Aff. ¶ 56. Debtor exerted no control over ABL Farms. Richert Aff. ¶ 57. ABL Farms and Richert Funding had no relationship prior to ABL Farms being introduced to Richert Funding by two bankers, including Brian Wickman, VP Business Banking at BMO and line of business relationship manager. Ex. 1 p. 38:13-24.

3

**RESPONSE:** Admitted that Debtor was not an officer, director or employee, but otherwise denied. Richert admitted at deposition that Richert Funding was the "driving force" behind ABL's business and that they were doing ABL's "back office with the accounts receivable." (BMO Counter-Statement of Facts ("CSOF") Ex. B3 [Richert Tr.] at 126:2-14.) Exhibit 1 does not state that BMO introduced ABL to Richert.

      **e.**    **Southern Mellon [sic]**

9.     Danny Letsinger, VP of ABL Farms, owned a separate company named Southern Melon Distributors, Inc. ("Southern Melon" or "ABL Affiliate"), an affiliate of ABL Farms, that purchased and sold watermelon to ABL Farms, among other companies. (Ex. 1 p. 283:13-25, p. 326:14-16.)

**RESPONSE:** Admitted.

10.    Debtor was neither an owner, officer, director, or employee of Southern Melon. Richert Aff. ¶ 63. Debtor exerted no control over Southern Melon. Richert Aff. ¶ 64. Southern Melon and Richert Funding had no relationship. Richert Aff. ¶ 66.

**RESPONSE:** Admitted that Debtor was not an officer, director, or employee, but otherwise denied. *See* Response to Paragraph No. 8. In addition, Mr. Richert's affidavit simply states that he "never factored or engaged in business" with Southern Melon.

II.     **BMO's Damages Resulted from its own Actions and the Fraud and Check Kiting Scheme engaged in Between ABL Farms and Southern Melon, of Which Debtor Had No Part Which Means There is No Debtor Between Debtor and BMO and All of BMO's Claims for Relief Fail as a Matter of Law**

    a.      **BMO's Post-Mortem Analysis Demonstrates that BMO Ignored Clear Signs of Trouble With ABL Once the SBA Approved the Loan Guaranty**

11.     BMO's post-mortem of its loan to ABL Farms evidences that its decision to make the loan was based solely upon the guaranty of the Small Business Administration.

**RESPONSE:** Denied.  This is a conclusory statement with no citation to the record.

12.     On October 13, 2015, after two months of investigation of the ABL Farms' loss, BMO's upper management had the following email communication explaining exactly why BMO had not exercised the diligence that it should have in underwriting or monitoring the loan and the resulting consequences:

> ***This is the poster child for why we shouldn't just rely on a SBA guaranty for comfort***. $6 million in debt with $5 million SBA Guaranty. You would think our worst case is charging down to 75% guaranty level. Instead, we charge off almost $5 million and may need to disgorge more down the line.

Ex. 43 (emphasis added).

**RESPONSE:** Admitted in part, denied in part.  This is a partial quote from a member of BMO's Special Asset Management Unit, based on his knowledge at the time, not "upper management." The quoted language appears in the email, but does not address diligence, underwriting, or monitoring.  Moreover, this email was prepared before BMO became aware of Richert's fraud.

5

13.     On September 28, 2015, almost a month and a half after ABL Farms' default, BMO's management made the following observation about the field audit its sales team had allowed to be truncated:

> Yes - Let me know if we're going to be put in a position to have to further explain this. regardless of the [risk] rating (which was based on the modified scope [of the Field Exam] the report still flags multiple significant concerns that should have been heavily considered by LOB [the BMO Line of Business at Issue] and Credit in the decision to fund.

Ex. 41. The author forwarded the e-mail communication to another of BMO's management, stating: "Just fyi in the unlikely event anything comes your way on this. The issue isn't the audit rating or scope - it's that **evidently neither the LOB nor Credit actually read the report and considered it was saying** which was (sic) a lot of bad stuff." *Id.*

**RESPONSE:**  Admitted in part, denied in part. This is a partial quote from a field exam group manager, not a member of "BMO's management." Moreover, the quoted document was prepared well before BMO learned of Richert's involvement in the fraud.

14.     On October 8, 2015, almost two months after the loan failed, BMO's management drafted the following write up of the loan indicating that they still had not come to terms with the fact that its sales team had known Southern Melon was an affiliate and had intentionally fooled BMO's credit department from the start:

> After days of research, it had become clear that several inter-related companies unknown to the bank were involved in numerous transactions that appear to have inflated the balance sheet. ABL is no longer viewed as a viable business venture.

Ex. 42.

6

**RESPONSE:** Admitted that the quoted language appears, but otherwise denied. This is a partial quote from a member of BMO's Special Asset Management Unit, based on his knowledge at the time, not "BMO's management." The paragraph mischaracterizes the documents, which relates to a check kite scheme between ABL and Southern Melon, not the underlying BMO loan or the false and misleading statements of Richert.

      **b.**    **BMO's Reliance Solely on the SBA Guaranty is Further Evidenced by BMO's Credit Management Team Promptly Rejecting ABL's Application for a Loan Due to Numerous Risk Factors Concerning ABL's Operations <u>Before Reconsidering When SBA Guaranty is Obtained</u>.**

15.    On October 25, 2013, Dave Maraman, BMO's regional manager made the following statement about his expectations for loan volume the following year:

> I'm excited about Fiscal and Calendar year 2014. I expect us to "break-out" and have an outstanding year.

Ex. 36.

**RESPONSE:** Admitted.

16.    Brian Wickman, BMO's line of business relationship manager, recommended the ABL deal to BMO's credit department. Ex. 19 p. 23:3-17. Due to the size of the ABL loan, Dave Maraman, Mr. Wickman's supervisor, also recommended the loan to BMO's credit department. Ex. 19 p. 23:3-17.

**RESPONSE:** Admitted.

17.    Within 48 hours of receiving the credit presentation, Gary Nowak, one of BMO's credit managers declined the ABL loan. Ex. 19 p. 22:13-24. Mr. Nowak made the following findings and determinations concerning the soundness of ABL Farms request for a loan:

7

o    ABL Farms had a limited tenure, having only been open for a couple of years, it was not a lengthy, established business.

o    ABL Farms had a weak balance sheet and extremely thin margins because ABL Farms was a watermelon brokerage and only earns profits on the broker commissions ABL Farms earned.

o    The guarantor, Danny Letsinger "provides little if any substantive support."

o    ABL Farms experienced a rapid increase in revenues but not stabilized.

o    ABL Farms prepared internal unaudited financial statements, which may be viewed as less sound that audited financial statements prepared by an outside accounting firm.

o    ABL Farms' business model should be serviced by an asset based lending environment (e.g. factoring). BMO does "have an asset-based specialty group," but the size of this deal was not large enough for BMO's asset-based lending group to manage.

o    The necessary structure to monitor the ABL Loan exceeds what BMO's business banking group is "designed to accommodate."

o    "The structure of the RLOC [revolving line of credit] should have either reduced the advance rate or acknowledged the growers' rights under PACA [Perishable Agricultural Commodities Act] as a priming lien." By reducing the advance rate from 80% of the outstanding Accounts, BMO could mitigate the risk of potential claims from PACA suppliers that ABL Farms failed to timely pay for purchasing watermelons.

Ex. 19 p. 24:3-31:22, Ex. 20.

**RESPONSE:** Admitted in part, denied in part. The quoted language appears, but the paragraph mischaracterizes Mr. Nowak's observations and role. For instance, Mr. Nowak wrote that the "rapid increases in revenues have not fully stabilized," not that ABL itself had not stabilized.

18.    In March 14, 2014 after BMO's credit department declined the loan for the first time, members of BMO's sales team had the following exchange:

8

Wickman-- "Gary [from credit] declined the ABL Farms today. WE have discussed with Dave and are fully onboard with escalating this...."

Maraman-- "I just went to live link to escalate."

Ex. 37.

**RESPONSE:** Admitted in part, denied in part. The quoted language appears in Exhibit 37, but Mr. Maraman and Mr. Wickman were not members of the sales team. They were members of the business banking group.

19.     The ABL loan was elevated to Mr. Nowak's supervisor Mr. Jack Yong, VP and Manager Credit of BMO, for another credit review. Ex. 19 p. 22:13-24.

**RESPONSE:** Admitted.

20.     Mr. Yong, VP and Manager Credit of BMO, testified during his deposition in the N.D.Ga. case[2] that "from a financial standpoint [ABL Farms] was a bit -- it was new, it was highly levered and there wasn't a lot of equity in the business." Ex. 21 p. 11:22-13:8. In order to try to mitigate "against the fact that [ABL Farms] had very little tangible net worth and very high leverage," BMO's strategy was to find another lender willing to refinance BMO's loan, and "there wasn't a real strong secondary exit. The guarantors didn't bring much personal financial strength to the transaction…and then we structured around that by using an SBA product…that product is a loan guarantee from the federal government of 75 percent, which, in fact, really reduced our

---

[2] *BMO Harris Bank, N.A. v. Richert Funding, LLC, et al.*, Case No. 1:15-cv-3886-AT (United States District Court for the Northern District of Georgia, Atlanta Division.

exposure to 25 percent advances on the collateral and gave us an underpinning our base of equity of cushion that we could consider equity in the transaction." Ex. 21 p. 11:22-13:8.

**RESPONSE:** Admitted in part, denied in part. The statement is a collection of selective, partial quotes of Mr. Yong's testimony. For instance, Mr. Yong testified, "[ABL] certainly fit our marketplace and it certainly was – I would say the company was within the comfort zone, however, from a financial standpoint it was a bit – it was new, it was highly levered and there wasn't a lot of equity." (Ex. 21 at 12:1-6.) Mr. Yong also noted that "[ABL] certainly was growing" and was "viable and profitable."

21.     Due to ABL Farms' risky financial condition, BMO wanted to refer ABL Farms "to another asset-based lender who would look at refinancing and then what [BMO] would do while they were successful and could build their net worth and their retained earnings, [BMO] would bank [ABL Farms] so we would provide cash management tools to allow us to follow the company for a couple of years…and at the end of two years if [ABL Farms] had performed in the way that we had hoped, [BMO] could then take the loan on by ourselves with the additional equity." Ex. 21 p. 13:15-14:7. BMO was unsuccessful in referring ABL to another asset-based lender. Ex. 21 p. 13:15-14:7.

**RESPONSE:** Admitted in part, denied in part. None of the cited testimony describes a "risky financial condition" at ABL or suggests that BMO was "unsuccessful" in referring ABL to another lender. Rather, Mr. Yong stated that he would be comfortable approving ABL either "in a limited participation with an asset based lender" or "with the additional support of the SBA cap program."

10

(Ex. 20 at 2.) Mr. Yong testified that BMO became comfortable proceeding with the ABL loan with the support of the SBA guaranty. (Ex. 21 at 22:12-23:3.).

22.     Mr. Yong, VP and Manager Credit of BMO, "suggested using an asset-based lender who are better suited for monitoring asset-based-loans or potential -- which would give [BMO] comfort that the assets were being monitored well." Ex. 21 p. 22:4-23:3.

**RESPONSE:** Denied. Mr. Yong said he would be comfortable approving a loan in participation with an asset-based lender *or* with support of an SBA guaranty. (Ex. 20 at 2; Ex. 21 at 22:12-23:3.)

23.     Mr. Yong, VP and Manager Credit of BMO, agreed with Mr. Nowak and declined the ABL loan. Ex. 21 p. 13:9:14.

**RESPONSE:** Denied.  Mr. Yong testified that the credit department declined the loan without a credit enhancement like an SBA guaranty.

24.     On March 18, 2014, Mr. Yong emailed another BMO employee named Chris Morris, identifying reasons that he decided not to approve a loan to ABL, stating "[a]nyway LOB [Mr. Wickman] feels they got the rug pulled out from under them. During the discussion offered to structure with the SBA to provide so exit support or to do an asset based lending deal where we could get the banking and take small piece of the loan to gain experience." Ex. 22. Mr. Yong explained the political tensions "cultures clashing," between BMO and another bank called M&I Bank that BMO had absorbed in connection with Mr. Yong's decision to decline the ABL Farms loan. Ex. 21 p. 25:12-27:16.

**RESPONSE:**  Admitted in part, denied in part.  See Response to Paragraph No. 21.

11

25.    BMO was aware of Southern Melon, an affiliate of ABL Farms that also sought to obtain a loan from BMO in 2014. Ex. 10 p. 59:10-16.

**RESPONSE:**  Denied. The cited testimony does not support the statement, including specifically with regard to the conclusion that Southern Melon was an "affiliate" of ABL.

26.    Wickman, VP Business Banking for BMO, emailed Danny Letsinger, VP of ABL Farms and owner of Southern Melon, as early as November 4, 2013, stating "I would take an approach of carving out a separate line amount for Southern Melon since they are a subsidiary of ABL." Ex. 35.

**RESPONSE:**  Admitted.

27.    On March 19, 2014, when it became clear that the existence of Southern Melon, an affiliate of ABL, might jeopardize the ability to get the SBA guaranty BMO's credit department required in order to approve the loan, BMO's SBL specialist wrote the following to its sales team:

> Do you guys have the DCT [Deal Conversion Template] or Livelink [program tacking the loan] that you can forward to Jim Ebben and myself. there might be some verbiage that needs to be massaged. Make sure it does not get final formed until we have a chance to sit down.

Ex. 38.

**RESPONSE:**  Admitted only that the quoted language appears in Exhibit 38, and otherwise denied. This quoted language has nothing to do with the existence of Southern Melon; and none of the quoted language suggests it does.

28.    Despite all of the problems identified in the foregoing paragraphs and initial declination of the loan, Mr. Yong, VP and Manager Credit of BMO, decided to reverse his

12

declination of the credit, and approved the loan to ABL Farms after *only* BMO issued a guarantee from the United States Small Business Administration guaranteeing up to 75% of the loan value. Ex. 21 p. 13:9-14.

**RESPONSE:** Denied. Mr. Yong did not "reverse" his decision; he always said he would approve the ABL loan with the support of an SBA guaranty. (Ex. 21 at 12-14; Ex. 20 at 2.) And, in addition to securing an SBA guaranty of the loan, which is designed to encourage lending to small businesses and provide credit enhancement, ABL and Richert submitted updated financial statements showing improvements to the business.

**III.    Debtor did not Make any Representation to BMO Let Alone Any Material Misrepresentations to BMO**

    **a.    Debtor Never Had Any Direct Communication with BMO relating to ABL Farms or the ABL Loan Until Inquiring with BMO After ABL Farms Defaulted**

29.    Notwithstanding, BMO's lack of reliance on anything other than the SB A Guaranty, it is undisputed that the Debtor in this case never directly communicated with BMO relating to ABL Farms, whether individually or on behalf of Richert Funding, until after ABL Farms defaulted on its Loan. Ex. 10, p. 26:9-21; Richert Aff. ¶¶ 24, 53, 54, 61, and 68.

**RESPONSE:** Denied. The first phrase is unsupported legal argument. As to communications, Richert directed the submission of the false payoff letter to BMO as well as the aging reports. Garbrecht had no authority to act without express direction from Richert. (*See, e.g.,* BMO CSOF Ex. B3 [Richert Tr.] at 127:1-6 (confirming that Richert authorized Garbrecht to release false and misleading aging reports).)

13

**b.**    **The September 22, 2014 Richert Aging Report Provided by Richert Funding Accurately Reflected All Amounts Outstanding with ABL Farms as of the Time the Report was Generated**

30.    The September 22, 2014 Richert Aging Report provided to BMO by Richert Funding accurately reflected all amounts outstanding with ABL Farms at the time the Report was generated. Richert Aff. ¶¶ 30, 70, and 83.

**RESPONSE:** Denied.  Richert cites only his self-serving affidavit in support of this statement, which is hearsay and lacks sufficient foundation to confirm the accuracy of the September 22 report.  Moreover, his own deposition testimony contradicts this statement.  When asked point blank at deposition at his deposition if Richert Funding was owed $5.1 million as of September 22nd, Mr. Richert testified that he did not know the exact number.  (CSOF Ex. B3 [Richert Tr.] 158:22-159:3.)  Regardless, it was not unreasonable for BMO to conclude it was reasonable for ABL to have paid down its credit line by $1.2 million based on summer watermelon sales and collections.

31.    Richert Funding used Win!Factor ($^{TM}$) Invoice Tracking System ("WinFactor") to track all amounts outstanding to its clients, including the Accounts Richert Funding had factored for all its Factoring Clients. Richert Aff. ¶ 9.

**RESPONSE:** Admitted.

32.    The information contained in the WinFactor System was maintained for Richert Funding's own internal business purposes and was used by Richert Funding to track all outstanding obligations of Richert Funding's clients, including factored Accounts. Richert Aff. ¶ 10.

14

**RESPONSE:** Denied.  The system was not used only for internal purposes.  Richert performed "back office" collection functions for ABL and also tracked accounts receivable for purposes of reporting to its own lender and shared aging reports with BMO as part of its due diligence process. (CSOF Ex. B3 [Richert Tr.] 126:7-14, 44:25-45:13.)

33.    On Monday, September 22, 2014 at 10:13 a.m. Mr Wickman, VP business Banking at BMO, emailed Mr. Garbrecht, VP of Sales and Marketing at Richert Funding, stating "[w]e will not be able to get everything completed by the end of the month. I will give you a heads up when we are a week away. Could you send me a current A/R aging report for ABL?." Ex. 12. Dwight Richert was **not** included on this e-mail communication. *See id.*

**RESPONSE:** Admitted.

34.    Mr. Garbrecht, VP of Sales and Marketing at Richert Funding, responded in an email attaching a document titled "Aging for ABL Farms, Inc." in .pdf format, concerning an accounts receivable aging report for ABL (the "September 22, 2014 Richert Aging Report"). Ex. 13. Dwight Richert was **not** included on this e-mail communication. *See id.*

**RESPONSE:** Admitted in part, denied in part.  Richert authorized Garbrecht to send the aging report.  (CSOF Ex. B3 [Richert Tr.] at 126:21-127:6.)

35.    On September 22, 2014 at 11:30 a.m., Mr. Garbrecht, VP of Sales and Marketing at Richert Funding, sent an email to Mr. Wickman, VP Business Banking at BMO, stating "**[l]et me know if you need an updated one [Aging for ABL Farms, Inc.] mid-week or so**. If you pin down a date, that would be great also." (emphasis added) Ex. 18. Dwight Richert was **not** included on this e-mail communication. *See id.*

15

**RESPONSE:** Admitted in part. See Response to Paragraph No. 34.

36. The September 22, 2014 Richert Aging Report listed all current outstanding Accounts that Richert Funding purchased from ABL Farms, broken down by invoice numbers, invoice dates, invoice amount, and customer name. Ex. 13. The September 22, 2014 Richert Aging Report included the total amount of ABL Farms' debt to Richert Funding. Richert Aff. ¶¶ 30, 70, and 83.

**RESPONSE:** Denied. The evidence cited does not support the statement. The September 22 Aging Report contains columns for that information, but much of that information was false and misleading. As set forth above and below, Richert's aging reports contained fake invoices and "recycled invoices"; the report is also unauthenticated hearsay. In addition, as noted above, Richert's statements about amounts due are directly contradicted by his own deposition testimony.

37. The September 22, 2014 Richert Aging Report provided by Richert Funding listed the face amount of all ABL Farms' factored invoices in the total face amount of $6,405,200.05 **and reflected all of Richert Funding outstanding advances and the grower advances to ABL totaling $5,124,159.87**. Ex. 10 p. 109:9-110:24 (emphasis added).

**RESPONSE:** Denied. See Response to Paragraph No. 36.

38. The total amounts listed in the September 30, 2014 ABL Aging Report were approximately $600,000.00 less than the amounts listed in the September 22, 2014 Richert Aging Report. Ex. 10. 111:13-116:4.

**RESPONSE:** Admitted.

16

39.     BMO never contacted Richert Funding to inquire about the content of the September 22, 2014 Richert Aging Report. Ex. 6 p. 32:2-4.

**RESPONSE:**  Denied.  The cited testimony does not address this issue or support the statement and no other evidence is cited.

40.     BMO's expert witness Mr. Colin McClary testified at his deposition that:

Q:  And as we sit here today you cannot point me to a single invoice on Exhibit Number 3 [the 9/22 Aging] that you believe was -- that you can conclusively tell anybody was a grower advance?

A. No, I cannot.

Q:  Okay. And you also can't tell me any invoices that you can conclusively show to me was never paid.

A. Again, there's receivables that were never paid in that window through that, you know, the rebate statements so --

Q. You can show me receivables that weren't paid within the 30- day window that you looked at --

A. Um-hmm.

Q. -- but you can't show me any receivables that were never paid, right?

A. I can't definitively tell you a specific receivable whether it was ever paid or not.

Ex. 47 p. 132:23-133:15.

**RESPONSE:**  Admitted in part, with the clarification that Mr. McClary testified that it was likely that ineligible grower advances were included on the report because Richert was advancing funds against them, and Richert had testified that the reports reflected collateral advanced against.

17

    **c.** **BMO Requests the September 30, 2014 ABL Aging Report from ABL Farms and Relies on the September 30, 2014 ABL Aging Report to Prepare the <u>Initial Borrowing Base Certificate and Fund the ABL Loan</u>**

41.    Further, while Mr. Garbrecht, VP of Sales and Marketing at Richert Funding, sent the September 22 Aging Report to Mr. Wickman, VP Business Banking at BMO, Mr. Chapman, Field Examiner at BMO, asked Danny Letsinger, VP of ABL Farms, to send him an aging report, and in response Danny Letsinger sent an email attaching an excel spreadsheet titled "SEP30 AR 2014.xlsx" containing a listing of ABL Farms' accounts receivable as recorded within ABL Farms' record keeping software called "FAMOUS" (the "September 30, 2014 ABL Aging Report"). Ex. 14, Ex. 1 p. 122:17-125:21.

**RESPONSE:** Admitted.

42.    The September 30, 2014 ABL Aging Report was prepared by ABL Farms' employee Tim Maxwell. Ex. 1 p. 122:17-125:21. Debtor had no participation in preparing the September 30, 2014 ABL Aging Report. Richert Aff. ¶ 71.

**RESPONSE:** Denied. Mr. Letsinger testified about who "likely" prepared the report, and testified that Maxwell would have prepared it based, at least in part, on rebate reports from Richert. (Ex. 1 at 123:3-124:4.) Richert's statement about his lack of participation in the report's preparation lacks foundation and is based on hearsay as to other parties. It is also not credible. Richert testified at deposition that his company acted as ABL's "back office" for purposes of accounts receivable and collections. (CSOF Ex. B3 [Richert Tr.] at 126:7-14.) A reasonable inference is that Richert was directly involved in preparing the report.

43.     BMO relied on the September 30, 2014 ABL Aging Report to prepare the initial Borrowing Base Certificate to fund the ABL Loan, Ex. 10 p. 89:10-90:4, despite vast differences with the September 22, 2014 Richert Aging Report, with large discrepancies and inconsistencies concerning invoice amounts that were identified in both reports. Ex. 15.

**RESPONSE:** Denied. The cited information does not support the statement, and BMO's expert McClary confirmed that the September 30 Aging Report is generally consistent with a "roll-forward of the 9/22 Aging Report and contains much of the same false and misleading information contained in the 9/22 Aging Report prepared by Richert, updated through September 30th." (CSOF Ex. T [McClary Report] at 3-4, 11.)

44.     Mr. Chapman, BMO's Field Examiner, never inquired from Danny Letsinger, VP Business Banking at BMO, or Richert Funding about the discrepancies and concluded that "it didn't seem unreasonable that the value could change by $600,000 in a week." Ex. 10. 111:13-116:4.

**RESPONSE:** Denied. Mr. Chapman testified, "the way the factoring relationship was explained to me from Danny [at ABL] is the fact that AR was factored daily, it didn't seem unreasonable that the value could change by $600,000…." (Ex. 10 at 113:7-11.)

45.     In addition, Mr. Chapman, BMO's Field Examiner, did not communicate with ABL's outside accounting firm, Frazier & Deeter to obtain any information in connection with the field examination. Ex. 10 p. 130:17-21.

19

**RESPONSE:** Admitted in part, denied in part. Mr. Chapman testified that he never communicated *directly* with Frazier & Deeter. (Ex. 10 at 130:17-21.) But he did receive financial statements prepared or reviewed by them.

46.     BMO's Senior Vice President, Dave Maraman, and corporate representative testified that he expected Mr. Chapman, Field Examiner at BMO, to communicate with ABL Farms' accounting firm to verify the accuracy of the information contained in the borrower's records. Maraman Ex. 16 p. 144:20-145:10.

**RESPONSE:** Denied. Maraman was asked a hypothetical question about whether a field examiner who could not validate records internally should go talk to the accountant. He answered in the affirmative, but then said he would not fault them if they did not. (Ex. 16 at 144:20-145:23.) Maraman did not offer an opinion about Chapman or the ABL field exam.

47.     The BMO underwriters decided not to obtain the underlying documents and agreements between ABL Farms and its suppliers in order to evaluate the monetary and non-monetary terms that governed ABL Farms' relationships with suppliers. Ex. 10 p. 39:15-40:9.

**RESPONSE:** Denied. Chapman testified that to his knowledge the purchase contracts were not reviewed. There is no evidence that BMO failed to consider or evaluate the monetary and non-monetary terms between ABL and its suppliers. Indeed, BMO's 10/21/14 Field Exam Report considers and evaluates ABL's accounts payable. (Ex 11 at BMO27820.)

48.     On October 14, 2014, when BMO's management received a summary of field reports, including the loan at issue, the following discussion was had:

Rich, the S-4 has makings of a deal where we are falling in love with revenue and not watching the operational controls. Revenue jumped huge last year and my guess is so did our exposure. Might be a great story, but we should try and keep an eye on it (it's a Florida deal) if we haven't already.

Ex. 40.

**RESPONSE:** Denied. The discussion involved another unrelated loan involving a different borrower. There was no discussion of the ABL loan in the referenced email.

> **d.    BMO Closes the ABL Loan and Pays Richert Funding $3.89 million in exchange for Richert Funding Releasing its Senior Security Interest in ABL Accounts.**

49.    ABL Farms and Richert Funding agreed that the balance of the debt owed to Richert Funding after Richert Funding received payment from BMO in the amount of $3.89 million would be converted to a separate obligation, as an unsecured term loan accruing interest at 18% per annum. Ex. 6. p. 132:11-133:12. All of ABL Farms' debt under the 2011 Factoring Agreement would be satisfied, and the new obligation was guaranteed by Danny Letsinger, VP Business Banking at BMO, and several of his family members. Ex. 6. p. 125:3-22.

**RESPONSE:** Denied. The cited evidence does not support the statement. The First Factoring Agreement was never paid off, and Richert Funding's remaining indebtedness remained secured. The remaining indebtedness was documented in the Secret Factoring Agreement dated October 15, 2014. (CSOF ¶¶ 25-27; *see also* Ex. B3 [Richert Tr.] at 125:3-126:6 (admitting executing of Secret Factoring Agreement).) The Secret Factoring Agreement, which is identical to the First Factoring Agreement, created a security interest in all assets of ABL, and contemplated the purchase by Richert of all ABL accounts receivable. (CSOF ¶¶ 25-27.)

21

50.     Richert Funding recorded the new term loan in its standard Winfactor factoring software system, and had ABL Farms sign the related template factoring documentation to memorialize the carry over debt. Ex. 6. P. 53:11-23. Richert Funding prepared the documentation on or about October 15, 2014, because Debtor was heading to Europe on vacation. Richert Aff. ¶ 34. A fully executed version of this loan document wasn't delivered before Debtor left for his vacation on October 19, 2014. Richert Aff. ¶ 40.

**RESPONSE:**  Admitted in part, denied in part. BMO denies that there was a "new term loan"; there was only remaining indebtedness from the First Factoring Agreement, which was documented in the Secret Factoring Agreement. (CSOF ¶¶ 25-27.)

51.     Mr. Garbrecht, VP of Sales at Richert Funding, and Mr. Sean Dudly, BMO's outside attorney employed by Burr & Forman LLP, had a telephone call on October 20, 2014. During the call Mr. Garbrecht notified Mr. Dudley that Danny Letsinger, VP of ABL Farms, had told Mr. Garbrecht that ABL Farms was eligible to receive $3.89 million from BMO at the time of closing. Ex. 4. P. 130:16-22.

**RESPONSE:**  Denied. Garbrecht testified, "I told him [Dudley] that Danny Letsinger had told me that the payoff was going to be – or what he was eligible was 3.89 was his eligibility, and I said that would be fine." Garbrecht also testified, "I confirmed [to Dudley] that 3.89 was the payoff." (CSOF Ex. B2 [Garbrecht Tr.] at 131:19.)

52.     The amount of the payoff agreed to was based on the amount that ABL Farms told Richert Funding ABL Farms qualified to receive from BMO, $3.89 million. Ex. 6. p. 132:11-133:12.

22

**RESPONSE:** Denied. The cited testimony does not support the statement. Richert testified that he became aware that there was not going to be enough in the BMO line to pay off Richert Funding. Richert testified that he discussed with Danny Letsinger whether, depending on how much ABL qualified for from BMO, Richert would determine if they were willing to continue to fund him. Richert did not testify that the "payoff amount" was tied to how much BMO was willing to fund. (Ex. 6 at 132:11-133:12.)

53.     On October 21, 2014, ABL Farms owed Richert Funding approximately $5.1 million, nearly the same amount that was reflected in the September 22, 2014 Richert Aging Report which had been provided to BMO a few weeks before. Ex. 6. p. 154:12-155:3.

**RESPONSE:** Admitted in part, denied in part. There is no support for the proposition that Richert was owed $5.1 million as of September 22, 2014.

54.     Approximately 9.5 hours later, on October 20, 2014 at 10:46 p.m., the day before BMO scheduled to close the ABL loan, BMO's attorney, Mr. Dudley emailed Mr. Garbrecht, VP of Sales and Marketing at Richert Funding, attaching a one-page document titled "Loan Payoff Agreement" which read:

Loan Payoff Agreement

October 21, 2014

A.B.L. Farms Inc.
6101 CR 136
Live Oak, FL 32060

Ladies and Gentlemen:

23

In connection with the loan (the "Loan") from Richert Funding, LLC ("Richert") to A.B.L. Farms Inc. ("Borrower"), effective immediately upon Richert's receipt of a payment of $3,890,000 from or on behalf of Borrower, Richert hereby:

1.      Acknowledges and confirms that the Loan, including but not limited to all principal, interest; fees, costs and expenses, has been repaid and satisfied in full, and that the Loan and all documents evidencing it (the "Loan Documents") are terminated and of no further force or effect, except for those obligations that by their express terms survive termination of the Loan Documents;

2.      Terminates and releases all pledges, guarantees, security interests, liens, mortgages and other encumbrances granted to Richert;

3.      Authorizes Borrower to cancel all instructions to Borrower's account debtors that had instructed them to forward payments under the Borrower's accounts receivable (the "Accounts") directly to Richert;

4.      Agrees to prepare and file all such UCC termination statements and such other release, termination and other documents and related filings as may be necessary to effect the provisions of this letter; and, to the extent that Richert fails to prepare and file any such release, termination or other document necessary to effectuate the provisions of this letter within 10 days after the date of this letter, then Richert authorizes Borrower, BMO Harris Bank, N.A. (the "Bank"), and the Bank's attorneys and other authorized agents to prepare and file such releases, terminations or other documents; and

5.      Agrees to promptly release and deliver to the Bank all collateral, if any, currently in Richert's possession pertaining to Borrower, and, without limiting the foregoing, agrees to hold in trust for, and promptly turn over to the Bank any further payments received by Richert under the Accounts on and after the date hereof.

This letter agreement is governed by Florida law, and an electronically transmitted signature will be valid and binding with the same force and effect as an original manual signature.

Very truly yours,
RICHERT FUNDING, LLC
By:_____
Name:_____

Title: _____

Ex. 24.

**RESPONSE:** Admitted.

55.    Subsequent to the telephone call, on October 21, 2014 at 8:50 a.m., Mr Wickman, VP Business Banking at BMO, emailed Mr. Garbrecht, VP of Sales at Richert Funding stating "We will be sending you a wire for the full 3,890,000. This pays you off in full correct?" Ex. 23.

**RESPONSE:** Admitted.

56.    On October 21, 2014 at 1:14 p.m., Mr. Garbrecht, VP of Sales at Richert Funding responded to Mr. Wickman's email stating "Yes, we agree to the amount to release UCC and letter of redirection." Ex. 23.

**RESPONSE:** Admitted.

57.    The payoff letter was signed by Bart Garbrecht, VP of Sales Richert Funding. Ex.

**RESPONSE:** Admitted, with the clarifications that Paragraph 57 does not cite an exhibit and that Richert directed Garbrecht to sign the letter. (CSOF Ex. B2 [Garbrecht Tr.] at 141:23-142:5.)

58.    On or about October 21, 2014, ABL Farms and BMO entered into a Credit Agreement (the "First Credit Agreement"). Ex. 27.

**RESPONSE:** Admitted.

59.    Richert Funding did not request nor was provided with any draft or final version of the First Credit Agreement. Ex. 6. p. 154:21-155:1. Richert Funding had no knowledge of the terms and conditions contained in the First Credit Agreement. Ex. 6. p. 154:21-155:1.

25

**RESPONSE:** Denied. Garbrecht had multiple pre-closing communications with Wickman about BMO's loan and the upcoming closing. Danny Letsinger told Richert about loan terms, including "eligible" accounts. (CSOF Ex. B3 [Richert Tr.] at 141:17-25.) Moreover, Garbrecht testified that he knew from the outset that BMO held a "blanket" lien on ABL's assets. (Ex. B2 [Garbrecht Tr.] at 128:15-21.) A reasonable inference is that Garbrecht and/or Letsinger advised Richert of the material terms and conditions of BMO's Credit Agreements.

60.    Richert Funding accepted payment from BMO totaling $3.89 million, and terminated the 2011 Factoring Agreement and deemed all of ABL's factoring obligations to have been satisfied. Ex. 6 p. 166:7-12.

**RESPONSE:** Admitted in part, denied in part. Richert accepted BMO's money, but did not deem ABL's obligations satisfied. (CSOF ¶¶ 28-33.)

61.    On October 22, 2014, Richert properly terminated its initial UCC-1 financing statement naming ABL as debtor, by causing a UCC-3 Financing Statement amendment to be filed in the Florida Secured Transactions Registry terminating the initial financing statement. Ex. 25.

**RESPONSE:** Admitted in part, denied in part. Richert and Richert Funding did not act "properly." They took a replacement pocket lien on all assets of ABL through the Secret Factoring Agreement, a lien they subsequently perfected. (CSOF ¶¶ 25-33.)

62.    Richert Funding released all ABL customers (i.e. account debtors) from the obligation to pay all Accounts to Richert Funding by delivering to ABL a Letter of Notification Release for issuance to ABL's customers. Ex. 26.

**RESPONSE:** Denied. The cited evidence does not support the statement. Exhibit 26 is a Letter of Notification Release, but Defendants offer no evidence that it was delivered to ABL or its customers, much less that it somehow overrode the Secret Factoring Agreement, pursuant to which Richert continued to purchase all of ABL's accounts receivable. (CSOF ¶¶ 25-33.)

63.    As Richert Funding agreed, after the payoff occurred Richert Funding delivered to ABL Farms, or returned to ABL Farms' customers, all money Richert Funding received from any customer of ABL after October 22, 2014. Ex. 6. p. 170:19-171:12.

**RESPONSE:** Denied. Richert testified that Richert Funding was responsible for turning over funds received from ABL's customers and that "some payments" were forwarded to BMO. Richert does not claim to have knowledge of all payments. (CSOF Ex. B3 [Richert Tr.] at 170:19-171:25.)

## IV.    **The Factoring Relationship between ABL and Richert Funding.**

64.    In 2011, Danny Letsinger and Aaron Letsinger, on behalf of ABL Farms met with Brian Wickman and a branch manager of the Maitland office of M&I Bank, which shortly thereafter became BMO, seeking a line of credit. (Wickman Deposition) Ex. _ p. 16:1-17.

**RESPONSE:**  Admitted.

65.    ABL Farms was seeking a small line of credit, but Wickman declined, on behalf of M&I because of the newness of ABL Farm's business and referred ABL Farms to Richert Funding. (Wickman Deposition) Ex. _ p. 17:6-11.

**RESPONSE:**  Denied. Wickman testified that ABL was seeking "a smaller line of credit" and that he felt like BMO "wouldn't be the right fit" "[a]fter meeting with them and assessing the newness

27

of their business." (Ex. 33 at 17:5-12.) ABL had already been referred to Richert Funding by another bank. (*Id.*)

66.    In 2011 ABL Farms, through its manager Danny Letsinger, submitted an application to Richert Funding requesting a $50,000 line of credit. Ex. 1 p. 38:7-40:23.

**RESPONSE:** Admitted.

67.    On October 10, 2011, Richert Funding and ABL Farms entered into a Factoring and Security Agreement (the "2011 Factoring Agreement"). Ex. 1 p. 46:5- 14, Ex 2.

**RESPONSE:** Admitted.

68.    Pursuant to the Factoring Agreement, ABL Farms sold accounts receivable ("Accounts") to Richert Funding that ABL Farms represented and warranted qualified as "Eligible Accounts." Ex. 1 p. 39:16-25, Ex. 2 p. 1.

**RESPONSE:** Admitted.

69.    Pursuant to the Factoring Agreement, ABL Farms granted Richert Funding a first priority ownership interest in all Accounts Richert Funding purchased from ABL Farms, and also granted to Richert Funding a first priority security interest in ABL Farms' "Collateral" (as defined in the Factoring Agreement), including, without limitation, all accounts, equipment, inventory, goods, etc., and all proceeds thereof. Ex. 2 p. 2.

**RESPONSE:** Admitted.

70.    On October 12, 2011, Richert Funding duly perfected its ownership interest in the purchased Accounts and its first priority security interest in all other Collateral by causing a UCC-

28

1 Financing Statement to be filed with the Florida Secured Transaction Registry, which was assigned filing number 201105474249. Ex. 5.

**RESPONSE:** Admitted.

71.    Pursuant to the Factoring Agreement, and the Uniform Commercial Code Section 9-406, Richert Funding delivered written letters to ABL Farms' customers (i.e. account debtors), giving notice that ABL Farms assigned all Accounts to Richert Funding, and requested ABL Farms' customers to remit payment on all Accounts directly to Richert Funding ("Richert Notice of Assignment"). Ex. 2 p. 3.

**RESPONSE:** Denied. The cited evidence does not support the statement. The First Factoring Agreement attached as Exhibit 2 authorizes Richert Funding to take those actions, but there is no evidence cited that they did so.

72.    Richert Funding and ABL Farms agreed that pursuant to the 2011 Factoring Agreement, ABL Farms would repurchase Accounts that aged past sixty (60) days (i.e. 60 days from the date of an invoice evidencing an Account). Ex. 1 p. 53:-54:6, Ex. 6. p. 26:4-14.

**RESPONSE:** Admitted.

73.    After ABL Farms repurchased from Richert Funding Accounts that aged past sixty (60) days, those old accounts were no longer identified in Richert Funding's invoice management software system called Winfactor. Ex. 6 p. 19:21-21:18.

**RESPONSE:** Denied. Richert did not testify that accounts were no longer identified automatically. At best, the evidence supports the conclusion that it was Richert's policy that repurchased invoices be removed from Winfactor, but there is no cited evidence about whether the

29

policy was enforced or that the documents at issue – including the information in the 9/22 Aging Report – were treated in this fashion.

74.     ABL Farms' business grew and ABL Farms inquired if Richert Funding would provide "grower advance" financing. Ex. 1 p. 41:14-22. The grower advances were used to pay watermelon growers or farmers for items such as packaging supplies, advancing freight to bring product to the United States, and other costs to grow the future watermelons that ABL Farms purchased and resold to its customers. Ex. p. 41:14-22.

**RESPONSE:**  Denied. The cited testimony does not support this statement. Letsinger described grower advances as "really any time you are giving something to a grower…"; and he did not tie them to ABL's business growth.

75.     Richert Funding provided grower advances to ABL Farms. The grower advances differ from factoring Accounts. Unlike factoring, Richert Funding did not acquire an ownership interest in any account and did not look to the customer for repayment, Richert Funding would lend money directly to ABL Farms, who would then fund the watermelon growers or farmers, and when ABL Farms turned a profit, ABL Farms would repay Richert Funding with interest.

**RESPONSE:**  Denied as unsupported. There is no evidence cited in support of Paragraph 75.

V.     **BMO Solicits ABL Farms' Business Ultimately Resulting in the ABL Loan**

76.     Beginning on March 14, 2013, Brian Wickman began soliciting ABL via e-mail communications with Danny Letsinger, looking to reconnect and stating the "BMO Harris has a real focus on Agricultural lending[,]" Ex. 48, and following up on October 23, 2013. Ex. 48

**RESPONSE:**  Admitted.

30

**VI.    BMO Underwrites ABL Farms' Application for a $5 Million Loan and Conducted a Curtailed Limited Scope Field Examination.**

77.    On May 5, 2014, BMO's Vice President, Business Banking, named Brian Wickman, emailed Bart Garbrecht, VP of Sales and Marketing at Richert Funding, notifying Mr. Garbrecht that he was working on ABL Farms' deal. Ex 7.

**RESPONSE:**  Admitted.

78.    On May 8, 2014, Mr. Wickman, VP Business Banking at BMO, emailed Mr. Garbrecht, VP of Sales and Marketing at Richert Funding, inquiring whether "[w]ould you be interested in funding the grower advances [for ABL Farms] and the affiliated company receivables? Let me know your thoughts." Ex. 8.

**RESPONSE:**  Admitted.

79.    BMO's internal "Policy, Guidelines & Procedures:  Collateral Valuation, Advance Rates and Monitoring" provides that field examination reports are recommended for loans secured with business assets collateral, and BMO's account management must respond to the field examiners findings and recommendations and indicate an action plan to be taken to remediation findings or implement recommendations. Ex. 9 p. 12.

**RESPONSE:**  Admitted in part, denied in part. Exhibit 9 states that "field exam reports are recommended for loans that are secured with business asset collateral, but not required." (Ex. 9 at 12.)

80.     As a matter of policy BMO requires field examiners to "not only look at the quality of the accounts receivable but also in the accuracy of the information that [BMO was] getting from the borrower." Ex. 16. p. 126:14-19.

**RESPONSE:** Denied. Maraman agreed with Richert's counsel that a field report was "supposed to" look at quality of earnings and accuracy of information. He did not purport to testify about BMO policy.

81.     In or around April or May 2014, BMO hired an outside audit company called LCG Advisors to perform an onsite field examine of ABL Farms. Ex. 10 p. 81:4-83:1.

**RESPONSE:** Admitted.

82.     Ms. Judy Belluso, an employee of LCG Advisors performed the field exam, and was unable to obtain information requested from ABL Farms that BMO normally required in conducting a field examination of a borrower. Ex. 10 p. 22:8-24:12.

**RESPONSE:** Denied. The cited testimony does not support the statement. Mr. Chapman testified that Ms. Belluso "prepared an exam report following her incomplete audit." Mr. Chapman did not attribute the incompleteness to "information requested from ABL that BMO normally required[.]"

83.     On April 16, 2014, after ABL Farms failed BMO's first effort to perform a field exam into its accounting practices and management abilities, BMO's sales representative made the following statement to ABL Farms:

> Wickman-- "Once I receive the report [of the failed field exam], I will push this through.. I am not planning on this affecting our ability to move forward with the line..."

Ex. 39.

**RESPONSE:** Admitted in part, denied in part. ABL did not "fail" the first field exam. It was incomplete. Mr. Wickman was not a sales representative. He was a business banker. The statement does contain a partial quote of Mr. Wickman's email, wherein he mentioned BMO's concern being the quality of ABL's accounts receivable and aging and requested additional information.

84.    On July 1, 2014, after it looked like ABL Farms would not go forward with the Loan, BMO's salesman Brian Wickman sent the following message to ABL Farms:

> Wickman-- "I hope that we can move this forward. I have put in a tremendous amount of time and effort on this and it would mean a lot to me personally to get this closed."

Ex. 44.

**RESPONSE:** Admitted in part, denied in part. Exhibit 44 is a status update on ABL's request for a line of credit, which is partially quoted above.

85.    BMO's internal field examiner, Mr. Chapman had very limited contact with Judy Belluso of LCG Advisors. Ex. 10 p. 22:8-24:12.

**RESPONSE:** Admitted in part, denied in part. In the cited testimony, Chapman does acknowledge that he had limited contact with Ms. Bellusso, but also states that he reviewed and considered the report that she prepared in conducting his follow-up exam. (Ex. 10 at 22:14-24:23.)

86.    On September 18, 2014, Danny Letsinger, VP ABL Farms, sent an email to Mr. Wickman at BMO attaching ABL Farms' responses to a BMO questionnaire that contained the following information:

> Q:  Who prepares the internal financial statements?
> **A:  Internal Financial Statements are prepared by controller and ownership [of ABL Farms]and turned in to accountants for review.**

33

Q: Which accounting software does the co. own?
**A: Famous**

Q: Who has unlimited access to the system?
**A: Controller, Owners [of ABL Farms]**

Q: Who prepares the bank deposits?
**A: Controller [of ABL Farms]**

Q: Who prepares/reviews the bank reconciliation?
**A: Controller, Owners [of ABL Farms]**

Q: Payroll
**A: Paychex**

Ex. 17.

**RESPONSE:** Admitted in part. This is some of the information reflected in Exhibit 17.

87.    Months later, in October 2014, in order to "fill gaps" as a result of the deficiencies in the prior field examination by Ms. Belluso, Brian Wickman, BMO's relationship manager instructed Mr. Chapman, BMO's field examiner, to perform a limited scope examination for ABL Farms, and forgo certain aspects of the normal audit procedure. Ex. 10 p. 99:16-101:4.

**RESPONSE:** Denied. Chapman testified that he was asked to do a "limited scope" a/k/a "follow up" field examination to fill in the gaps from Ms. Belluso's earlier, incomplete examination. There is no mention of "deficiencies." Chapman also testified that Wickman had requested the exam; he did not testify that Wickman told him to "forgo certain aspects of the normal audit procedure." (Ex. 10 at 99:16-101:4.)

34

88.     As BMO's field examiner, Mr. Chapman was responsible for conducting the due diligence, reviewing the collateral and presenting findings, recommendations to move the process of funding a loan forward. Ex. 10 p. 8: 6-12.

**RESPONSE:**  Admitted.

89.     On or about October 7, 2014, Chapman, BMO's Field Examiner, commenced the curtailed limited scope field exam of ABL Farms in order to conduct additional due diligence and obtain information from ABL Farms. Ex. 10. p. 21:14-18.

**RESPONSE:**  Denied. Mr. Chapman simply testified that he believed he commenced the field exam on October 7, 2014.  It does not reference a "curtailed" exam  or reference obtaining "additional due diligence" or "information."

90.     Mr. Wickman, VP Business Banking for BMO, decided not to permit BMO's Field Examiner, Mr. Chapman to perform the initial onsite field exam for ABL Farms in order to evaluate ABL Farms' operations, management and record keeping systems, instead BMO requested additional information from ABL Farms to review in order to complete the prior audit performed by LCG Advisors. Ex. 10 p. 13:4-15, p. 101:11-21.

**RESPONSE:**  Denied. Mr. Chapman testified that it was a decision by the credit team –  not Mr. Wickman or the business bank group – whether to send an external accounting firm or an internal auditor to a site visit. (Ex. 10 at 13:19-21.) Mr. Chapman performed his work on the follow up examination offsite. (Ex. 10 at 13:7-8.)

91.     BMO routinely performs testing for a borrower's cash receipts in order to ascertain information about receivables balances, collections, etc. Ex. 10 p. 44:12-24. Mr. Chapman, BMO's

35

Field Examiner, decided not to perform a cash receipts test because Richert Funding collected all of ABL Farms' Accounts. Ex. 10 p. 34:3-35:11.

**RESPONSE:** Admitted in part, denied in part. Mr. Chapman did not testify about routine practices.

92.    Mr. Chapman, BMO's Field Examiner, had no communications with Richert Funding in connection with his field examination and never requested any information from Richert Funding concerning ABL Farms' accounts and collections. Ex. 10 p. 26:9-13.

**RESPONSE:** Denied. Mr. Chapman testified that he did not speak to anyone at Richert Funding. Mr. Chapman reviewed and considered the 9/22 Aging Report from Richert. (Ex. 10 at 109:9-111:18.)

93.    Mr. Chapman, BMO's Field Examiner, "wanted a more current snapshot of where [ABL Farms] receivables were at," however, Mr. Wickman instructed BMO to move forward with closing on the loan without obtaining additional the information requested by Mr. Chapman. Ex. 10 p. 106:2-19.

**RESPONSE:** Denied. Mr. Chapman did not testify that Mr. Wickman denied him information or a "current snapshot." Mr. Chapman testified that he added the September 30th accounts receivable aging information to provide a more current snapshot of ABL.

94.    BMO created a Limited Scope Field Exam Report dated October 21, 2014 that stated, "Factoring statements itemizing factored invoices are provided by Richert [Funding] but were not obtained during this shortened exam." Ex. 11.

36

**RESPONSE:** Admitted in part, denied in part. The Report is a 19 page document that contains the quoted statement in footnote 4, regarding amounts purportedly due to Richert Funding as of June 30, 2014. There is no evidence that BMO ever obtained itemized factoring statements to support Richert's loan balance as of that date.

95.    On October 10, 2014, Mr. Chapman, BMO's Field Examiner, asked Danny Letsinger, VP of ABL Farms, to send him an aging report, and in response Danny Letsinger sent an email attaching an excel spreadsheet titled "SEP30 AR 2014.xlsx" containing a listing of ABL Farms' accounts receivable as recorded within ABL Farms' record keeping software called "FAMOUS" (the "September 30, 2014 ABL Aging Report"). Ex. 14, Ex. 1 p. 122:17-125:21.

**RESPONSE:** Admitted.

96.    The September 30, 2014 ABL Aging Report was prepared by ABL Farms' employee Tim Maxwell. Ex. 1 p. 122:17-125:21. BMO relied on the September 30, 2014 ABL Aging Report to prepare the initial Borrowing Base Certificate to fund the ABL Loan. Ex. 10 p. 89:10-90:4. Neither Richert nor Richert Funding had any part in preparing the September 30, 2014 ABL Aging Report. Richert Aff. ¶ 71.

**RESPONSE:** Denied. See responses to Paragraphs 42 and 43.

**VII.    BMO Exacerbates its Damages By Approving Floats and Overdrafts of an Additional $3 million by ABL Farms, Post-Closing Even Thought ABL Farms was Not Providing its Require Borrowing Base Reports or Other Financial Information Violating its Loan Covenants None, All of Which is Completely Unrelated to the <u>Debtor or Richert Funding</u>**

97.    ABL opened a Depository Account with BMO (Account #191-144-1) that ABL used to deposits funds ABL received. Ex. 28. p. 2.

**RESPONSE:**  Admitted.

98.    "BMO did not, and did not have authority to, apply funds from ABL's Depository Account or a separate Controlled Disbursement Account maintained at BMO by ABL. ABL had total unfettered discretion to use and apply any funds from either of the two bank accounts." Ex. 28 p. 2.

**RESPONSE:**  Denied as to "total unfettered." The cited evidence does not support the statement. BMO stated in its interrogatory response that "it did not have the authority to apply funds from ABL's accounts. ABL had discretion to apply funds from its accounts." But BMO did hold a perfected lien on ABL's accounts and the funds in them. (CSOF Ex. A1 § 2.10.)

99.    From the outset of their banking relationship, BMO approved numerous overdrafts for ABL's account due to ABL having had insufficient funds available in its bank account to cover debit transactions. Ex. 33 p. 153:20-154:1. Each overdraft required credit approval as an over advance, which constitutes another loan or additional exposure to BMO. Ex. 21 p. 50:6-13.

**RESPONSE:**  Denied. The cited evidence only discusses a reference to the word "overdraft" in an unattached document, not the existence of overdrafts or their number. With regard to overdraft procedure, Wickman testified that credit approval was required for either an overdraft or an over advance, but he did not equate the two.

100.    As a result of the overdrafts BMO approved, BMO provided extensions of credit to ABL, which as of August 2015 totaled nearly $3 million, which was in addition to the approximately $5 million initial loan BMO made to ABL. Ex. 9 p. 14. In addition, ABL incurred

unpaid late charges totaling the amount of $190,254.04 and Bank fees totaling the amount of $49,245.94. Ex. 9 p. 14.

**RESPONSE:** Admitted in part, denied in part. As a business customer, ABL was granted next day availability of funds from BMO. This was not a loan or formal credit extension, and none of the cited evidence supports that conclusion. ABL took advantage of that availability to engage in a check kiting scheme, which eventually resulted in a $2,958,482.10 overdraft. At no point in time prior to the check kiting scheme being discovered did ABL have a $2.958 million overdraft, or anything near it. Until that time, the deposited checks cleared. (*See, e.g,* CSOF Ex. A9; Ex. T [McClary Report] at 15.)

101.    Jack Yong, VP and Manager Credit of BMO, indicated in his initial credit review in early 2014 that due to increased credit risk, there should be no over-advances given to ABL Farms. Ex. 20 p. 2. BMO did not heed the recommendation of its own credit department.

**RESPONSE:** Admitted that Yong recommended against allowing overadvances in March of 2014, and otherwise denied. BMO did not approve any overadvances under the loans to ABL. See response to Paragraph 100. No evidence is cited for the proposition that "BMO did not heed the recommendation of its own credit department."

102.    By May 2015, BMO had received and approved forty-one (41) separate overdraft requests for ABL. Ex. 34 p. 24.

**RESPONSE:** Denied. Richert does not cite admissible evidence for this proposition, only an uncited hearsay statement from an opinion witness.

103.    According to the testimony of BMO's VP Business Banking, Mr. Wickman, as the months progressed in 2015, it "became harder and harder [for BMO] to obtain timely financial statements [from ABL Farms]," including additional borrowing base certificates, monthly reports, accounts payable and receivable reports. Ex. 33 p. 148:17-25.

**RESPONSE:**  Admitted.

104.    Richert Funding's expert witness, Mr. Scott Bouchner, having reviewed ABL bank records produced by BMO concluded that from January 26 through May 5, 2015, ABL's Depository Account balance was overdrawn on 39 of 71 days, approximately 55% of the time. Ex. 32, p. 11.

**RESPONSE:**  Denied. No evidence is cited for this proposition.

105.    Despite ABL's cash flow problems and continuous overdrafts, on May 8, 2015, BMO made an additional $1 million loan to ABL and entered into a second credit agreement (the "Second Credit Agreement"). Ex. 29.

**RESPONSE:**  Admitted in part, denied in part. BMO admits that it made an additional $1 million loan to ABL in May 2015. The evidence cited does not support the conclusion that this was despite cash flow problems or "continuous" overdrafts.

106.    BMO acknowledges that Richert Funding did not make any representations to BMO in connection with the Second Credit Agreement. Ex. 16 p. 608:9-20.

**RESPONSE:**  Denied. Maraman testified that he was not aware of "input" from Richert in the months leading up to the Second Credit Agreement. Maraman did not testify that Richert made no representations to BMO. Moreover, as set forth in detail in BMO's CSOF, Richert made a series

40

of misrepresentations that induced BMO to enter into both Credit Agreements, including that Richert was no longer factoring ABL's receivables, that it had been paid off in full, and that Richert had released all liens. (CSOF ¶¶ 18-38.)

### VIII.  BB&T, Southern Melon's Lender Discovers a Major Check Kiting Scheme between ABL Farms and Southern Melon Which Is the Cause of BMO's Damages

107.    The check kiting took place between ABL Farms and Southern Melon, ABL Farms' affiliate owned by Danny Letsinger who was VP of ABL Farms, grew considerably from September 2014 through August 2015. Ex. 32. BMO failed to discover the kitting activity, which was occurring well prior to BMO's approval of the Second Credit Agreement. Ex. 32.

**RESPONSE:**  Denied. Defendants do not cite to any evidence to support the assertion that ABL began check kiting prior to the Summer of 2015. Moreover, Defendant's expert, Bouchner, lacks sufficient evidence to determine when check kiting activity began. At a minimum, there is a fact question about when legitimate business transactions between ABL and Southern Melon were replaced by kiting.

108.    Over the approximately 12-month period, of the aggregate debit transactions in ABL Farms' bank account maintained at BMO totaling $161,562,304.13, Southern Melon accounted for $113,106,224.13, or 70%, of all debit transactions. In other words, transfers between ABL Farms and Southern Melon accounted for the significant majority of all ABL Farms transactions, with less than 30% of ABL Farms banking activity occurring between ABL Farms and third parties. Ex. 32 p. 7.

41

**RESPONSE:** BMO objects to Paragraph No. 108 on the grounds that it is irrelevant and misleading as to the timeframe referenced. Virtually all of the banking activity between Southern Melon and ABL took place between June and August 2015. (Ex. 32 at 4 (showing virtually all activity taking place between June and August 2015).)

109.    In August 2015, another bank, BB&T that had a lending relationship with Southern Melon discovered that Southern Melon was kiting checks with ABL Farms, and placed a hold on all transactions between ABL Farms and Southern Melon. Subsequently, BMO declared ABL Farms to be in default under the First Credit Agreement and Second Credit Agreement. Ex. 30. After ABL Farms defaulted on its loans with BMO, BMO's internal Special Assets Unit investigated ABL Farms, and made numerous findings and conclusions, including that "[i]t became apparent ABL Farms Inc. and Southern Melon were affiliate companies being managed on a consolidated basis although Southern Melon is not legally obligated to the subject credits... As the Consultant delved deeper into ABL Farms' financials, it was determined the company lacked any significant financial controls; including failing to accurately and adequately track payables and receivables, or formally close out financial records on a monthly basis. ABL Farms did not properly invoice all loads and freight correctly, dating back years resulting in unbilled and or unpaid AR. Management admittedly did not and does not have the capabilities to utilize accounting software to produce accurate financial information on a real time basis, calling into question the correctness of historical financial information." Ex. 31.

**RESPONSE:** Admitted.

999998.04309/124143155v.3

Dated this 6th day of December 2020.

Respectfully submitted,

/s/  Juliane M. Brumbaugh
Michael A. Nardella, Esq.
Florida Bar No.: 51265
Juliane M. Brumbaugh, Esq.
Florida Bar No. 113366
Nardella & Nardella, PLLC
135 W. Central Blvd., Suite 300
Orlando, FL 32801
(407) 966-2680
jbrumbaugh@nardellalaw.com
service@nardellalaw.com

**COUNSEL FOR PLAINTIFF, BMO HARRIS BANK, N.A.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of December 2020, a true and correct copy of the foregoing has been served via electronic mail to all parties registered to receive notices via CM/ECF.

Juliane M. Brumbaugh
Juliane M. Brumbaugh, Esq.

43