**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In Re:

RICHERT FUNDING, LLC, as                              Case No. 6:18-bk-06276-KSJ
substantively consolidated with                        Chapter 7
DWIGHT DONALD RICHERT and
HOLLY BERRY RICHERT

      Debtors
_____/

BMO HARRIS BANK, N.A.

      Plaintiff,                                   Adversary Proceeding

v.

DWIGHT DONALD RICHERT                                  Case No. 6:19-ap-00260-KSJ

      Defendants.
_____/

## PLAINTIFF'S COUNTER-STATEMENT OF FACTS

NOW COMES Plaintiff, BMO HARRIS BANK, N.A., by its undersigned attorneys, and states the following undisputed material facts in support of its opposition to Defendant DWIGHT DONALD RICHERT's motion for summary judgment:

**The Parties**

    1.    BMO Harris Bank, N.A. ("Plaintiff" or "BMO") is a national banking association. (*See* Defendant's Statement of Material Facts ("SOF") ¶ 2.)

1

2.    Debtor and Defendant Dwight Donald Richert ("Richert") is an individual who was the 100% owner of debtor Richert Funding, LLC ("Richert Funding"). (SOF ¶ 1.)

3.    Following the events described in more detail below, Plaintiff sued Richert and Richert Funding in federal court, alleging claims including fraud, fraudulent inducement, tortious interference with contract, and conversion. (See *BMO Harris Bank, N.A. v. Richert Funding, LLC et al.*, No. 1:15-cv-3886 (N.D. Ga.), Dkt. 8 (Am. Compl.) at *passim*.) Plaintiff's motion for partial summary judgment in that case, which described how Richert and Richert Funding indisputably bilked Plaintiff out of millions of dollars based on misrepresentations that Richert does not deny, was pending when the defendants, including Richert, filed for bankruptcy protection. (*See id.*, Dkt. 164.)

**Relevant Non-Parties**

4.    Richert Funding was a Florida limited liability company, the business of which included entering into factoring agreements with businesses. (SOF ¶ 4.)

5.    Bart Garbrecht ("Garbrecht") was an employee of Richert Funding. (SOF ¶ 5.)

6.    A.B.L. Farms, Inc. ("ABL") was a Florida corporation that operated as a distributor and dealer of produce, primarily in the brokerage and sale of watermelons. (SOF ¶¶ 6-7. ABL was owned by Aaron Letsinger and managed by his brother, Danny Letsinger. (SOF ¶ 6.)

2

124111940

**ABL Begins Factoring all of its Receivables with Richert Funding starting in 2011.**

7.      On or about October 10, 2011, Richert Funding and ABL executed that certain Factoring and Security Agreement (the "First Factoring Agreement"). (Ex. B2 [Garbrecht Tr.] at 42:15-15-43:13, Ex. F.)

8.      The First Factoring Agreement was a fully secured, recourse factoring agreement. (Ex. F ¶¶ 7, 8.) ABL sold virtually all of its receivables to Richert Funding in exchange for an advance calculated as a percentage of the receivables' face value; the balance was held in reserve. (*Id.* ¶¶ 2.1, 2.2; Ex. D ¶ 14 ("Richert Funding owned virtually all of the ABL Accounts and invoices[.]").) If Richert Funding received payment on an invoice, Richert Funding would apply the payment to the advance amount, plus fees, and refund what was left of the reserve, if anything, to ABL. (Ex. B2 [Garbrech Tr.] at 6:24-7:13.)

9.      As security for the financing, Richert Funding took a blanket, first priority security interest in all of ABL's assets. (Ex. F, ¶ 8.1.)

**Richert Funding's exposure to ABL grows to $8 million by 2014.**

10.      According to Richert, Richert Funding operated as ABL's "back office" once Richert Funding began factoring ABL's accounts receivable. (Ex. B3 [Richert Tr.] at 126:7-14.) Specifically, Richert Funding took direct ownership and control over ABL's accounts receivable and collected those accounts directly to pay down ABL's outstanding balance. (Ex. D, ¶ 11.)

11.      By 2014, Richert Funding's exposure to ABL had swelled from an initial

$50,000 at the outset of the relationship in 2011 to approximately $8 million. (Ex. B2 [Garbrecht Tr.] at 74:23-75:5, 90:7-16.)

12.    In a July 9, 2014 email, Danny Letsinger advised Richert, "I am flat broke." (Ex. R.)

13.    On or about August 18, 2014, Richert emailed Danny Letsinger to express his concern about continuing to be ABL's source of funding in "a second position in terms of collateral." (Ex. B3 [Richert Tr.] at 124:6-125:9; Ex. S.) Richert suggested that this concern could be alleviated by a "New Factoring agreement and personal guaranties from your father, brother and wife, and yourself and Sharon." (*Id.*)

## ABL borrows $5 million from BMO to, among other things, pay off Richert Funding in full.

14.    On or about October 22, 2014, ABL and BMO executed that certain credit agreement (the "First Credit Agreement") and security agreement (the "First Security Agreement") documenting a nearly $5 million revolving line of credit to be secured by a first priority security interest in all of ABL's assets, including ABL's accounts receivable that had been factored through Richert Funding. (Ex. A, ¶¶ 4, 7; Exs. A1 § 2.10, A3.)

15.    In the First Credit Agreement, ABL covenanted, among other things, that it would "use all proceeds from [BMO] pursuant to this Agreement for working capital and general corporate purposes only and not to repay indebtedness for borrowed money, except that Borrower will use the first disbursement of funds to

4

repay all outstanding indebtedness, if any owed to Richert Funding, LLC." (Ex. A1 §
5.9.)

16.    In connection with the BMO loan closing, ABL executed a Disbursement
Request and Authorization on or about October 21, 2014 that confirmed that $3.89
million of the initial advance would fund the "payoff" of Richert Funding. (Ex. A5; Ex.
A ¶¶ 5, 10.)

17.    On October 22, 2014, BMO funded an initial advance under the First
Credit Agreement of $4,557,192, $3.89 million of which was directed to be disbursed
to Burr & Forman LLP, for further disbursement to pay off Richert Funding. (*Id.*)

**Richert Funding submits to BMO a fraudulent payoff agreement confirming
a payoff of $3.89 million.**

18.    One day prior to close, October 21, 2014, Richert personally directed
Garbrecht to execute and deliver to BMO that certain Loan Payoff Agreement dated
October 21, 2014 (the "Richert Payoff Agreement"). (Ex. B2 [Garbrecht Tr.] at 141:20-
142:5; Ex. B3 [Richert Tr.] at 162:5-18; Ex. G.)

19.    The Richert Payoff Agreement stated that "[i]n connection with the loan
… from [Richert Funding] to [ABL], effective immediately upon [Richert Funding's]
receipt of a payment of $3,890,000 from or on behalf of [ABL]", Richert Funding,
without limitation:

> (a)    "Acknowledges and confirms that the Loan … has been repaid
> and satisfied in full, and that the Loan and all documents
> evidencing it … are terminated and of no further force or

effect…"

(b)     "Terminates and releases all pledges, guarantees, security interests, liens, mortgages and other encumbrances granted to Richert [by ABL]";

(c)     "Authorizes [ABL] to cancel all instructions to [ABL's] account debtors that had instructed them to forward payments under the Borrower's account receivables (the "Accounts") direct to [Richert Funding]";

(d)     "Agrees to promptly release and deliver to [BMO] all collateral, if any, currently in [Richert Funding's] possession pertaining to [ABL], and, without limiting the foregoing, agrees to hold in trust for, and promptly turn over to [BMO] any further payments received by [Richert Funding] under the Accounts on and after the date hereof."

(Ex. G.)

20.    Receipt of the Richert Payoff Agreement was a condition to close. (Ex. A1, §§3.1 (Conditions for Funding), 5.9 (Use of Proceeds and Conditions for Disbursement).) BMO would not have funded the initial advance or payoff to Richert Funding but for the Richert Payoff Agreement. (Id.; Ex. B4 [Wickman Tr.] at 51:12-52:4, 53:16-58:11.)

21.    In addition to the Richert Payoff Agreement, one day prior to close Wickman asked Richert Funding to confirm the payoff amount by email: "We [BMO]

6

will be sending you [Richert Funding] a wire for the full 3,890,000. This pays you off in full correct?" (Ex. B4 [Wickman Tr.] at 56:2-57:21; Ex. H.) Garbrecht responded: "Yes, we agree to the amount to release UCC and letter of redirection." (*Id.*)

22.    Richert Funding also confirmed the $3.89 million payoff to Richert Funding's counsel over the telephone. (Ex. B2 [Garbrecht Tr.] at 131:17-19 ("I confirmed that $3.89 million was the payoff.").)

23.    It was BMO's understanding at closing that Richert Funding had been paid off in full and that there were no other liens on ABL's property as of the closing of BMO's loan.[1] (Ex. B4 [Wickman Tr.] at 76:11-77:18.)

24.    Richert understood that the Richert Payoff Agreement required Richert Funding to hold in trust and turn over to ABL any funds it received in connection with any ABL accounts. (Ex. B3 [Richert Tr.] at 170:19-171:4; Ex. G.)

**Richert Funding and ABL execute a new, secret factoring agreement memorializing an additional $1.2 million in debt one week before the BMO loan to ABL closes.**

25.    On October 15, 2014, Richert Funding and ABL entered into that certain second Factoring and Security Agreement (the "Secret Factoring Agreement"). (Ex. C ¶ 14; Ex. E ¶ 8; Ex. I.) The Secret Factoring Agreement is identical to the First Factoring Agreement except for the date. (*Compare* Ex. F *with* Ex. I; Ex. B2 [Garbrecht Tr.] at 61:12-20.)

26.    Under the Secret Factoring Agreement, ABL offered for sale and Richert

---

[1]    The sole exception, which is not material to any issues in dispute, is a subordinated $650,000 loan ABL was permitted to take from Vulcan Ventures to fund advances to watermelon growers; that debt was disclosed to BMO and subject to a subordination agreement that severely restricted Vulcan's rights and remedies.

Funding purchased all of ABL's rights, title, and interest in and to ABL's accounts receivable. (Ex. C ¶ 16; Ex. E ¶ 10; Ex. I § 2.1.) The Secret Factoring Agreement further grants to Richert Funding a security interest in and lien on all of ABL's assets. (Ex. I § 8.1, Schedule 1 ¶ 6 "Collateral").

27.    The Secret Factoring Agreement documented an additional $1.2 million in liabilities from ABL to Richert Funding above and beyond the $3.9 million payoff from BMO. (Ex. B2 [Garbrecht Tr.] at 148:18-24.)

**Richert, Richert Funding, and ABL hide the existence of the Secret Factoring Agreement and related indebtedness from BMO.**

28.    Richert never told BMO about the Secret Factoring Agreement, and he never told BMO about the additional $1.2 million owed to Richert Funding beyond the $3.9 million "payoff." (Ex. B2 [Garbrecht Tr.] at 148:15-24; B3 [Richert Tr.] at 231:25-233:5 (confirming no disclosure of Secret Factoring Agreement or additional indebtedness); Ex. J [interrogatory responses] at 5 (confirming Defendants had no recollection of oral communications and failing to identify any relevant written communications).) When asked at deposition why the Secret Factoring Agreement and remaining $1.2 million indebtedness were hidden from BMO, Garbrecht testified that BMO hadn't asked. (Ex. B2 [Garbrecht Tr.] at 133:21-139:1.)

29.    On October 17, 2014, Garbrecht reported to Danny Letsinger that ABL's "buyout" was $5,114,557.82, "probably right at 1M over what BMO wires us." (Ex. B3 [Richert Tr.] at 155:4-11; Ex. K.)

30.    On October 20, 2014, two days prior to BMO's loan closing, Richert

8

Funding sent Danny Letsinger an email with the subject "payoff," stating "Right now the payoff is $4,886,610 and we do not have any more checks." (Ex. L; Ex. B2 [Garbrecht Tr.] at 127:4-21.) Richert Funding went on to state that they would "give you [ABL] an amount for the note, along with weekly payments." (*Id.*) The email was not sent to BMO. (*Id.*)

31.    Garbrecht did not inform BMO about the Secret Factoring Agreement or advise BMO that he had just told Danny Letsinger that the full amount of ABL Farms' debt to Richert Funding was $1 million more than what he had told BMO. (Ex. B2 [Garbrecht Tr.] at 148:15-24; Ex. B3 [Richert Tr.] at 231:25-233:5; Ex. J at 5.)

32.    BMO relied on Richert's statements and the Richert Payoff Agreement to fund the loan to ABL, including the $3.89 million Richert Funding payoff, with the understanding that Richert Funding "would no longer be in a lending position or a factoring position with ABL Farms; that [BMO] would be taking them out of the relationship [with ABL]". (Ex. B4 [Wickman Tr.] at 57:1-21.)

33.    On October 23, 2014, BMO perfected its security interest in ABL's assets, including all accounts receivable, by recording a UCC financing statement as File Number 201402445359 with the Florida Department of State. (Ex. A; Ex. A6.) On May 18, 2015, BMO perfected its interest under the Second Credit Agreement upon filing UCC financing statement no. 201503752087. (*Id.*)

**Richert Funding falsely advises BMO that Richert Funding has released it security interests and stopped factoring ABL's receivables.**

34.    On the date of the BMO loan closing, October 22, 2014, Garbrecht sent

an email to BMO attaching a Letter of Notification Release dated October 22, 2014 from Richert Funding signed by Richert. (Ex. B4 [Wickman Tr.] at 58:12-25; Ex. M.) The Letter of Notification Release advised that "ABL Farms, Inc. will no longer be factoring invoices." (*Id.*) No mention is made of the Secret Factoring Agreement. (*Id.*)

35.    Also on October 22, 2014, Garbrecht sent an email to Wickman that included a UCC financing statement amendment terminating the security interest granted by ABL to Richert Funding pursuant to the First Factoring Agreement. (Ex. B4 [Wickman Tr.] at 60:1-25; Ex. N.) Garbrecht did not mention that ABL had granted to Richert Funding a replacement security interest in all assets of ABL just seven days earlier. (*Id.*; Ex. C ¶ 14; Ex. E ¶ 8; Ex. I ¶ 8.1.)

**Richert Funding continues to purchase ABL's accounts receivable and receive payments under the Secret Factoring Agreement**

36.    Post-closing, Richert Funding continued to purchase "all of ABL's rights, title and interest in and to ABL's accounts receivable by making purchase price advances to ABL … ." (Ex. C ¶ 16; Ex. E ¶ 10.)

37.    Between October 22, 2014 and August 2015, Richert Funding received total payments from ABL of at least $10,183,342.84. (Ex. A ¶¶ 26, 27; Ex. A12.)

38.    The $10,183,342.84 that Richert Funding received from ABL were transferred from ABL deposit account(s) that ABL maintained at BMO. (*Id.*; Ex. A9.) None of those funds were held in trust or otherwise turned over to BMO. (Ex. A ¶ 27.)

**Richert directs ABL to falsify financial reports and invoices, and directs ABL in a check-kiting scheme.**

39.    Richert directed Richert Funding to create false and misleading aging

reports to BMO; the reports listed fake invoices and "recycled" invoices that had been adjusted to suggest they were not past due and uncollectible. (Ex. B3 [Richert Tr.] 45:16-52:5.)

40.     Richert also directed Richert Funding to engage in a check kiting scheme with ABL to induce BMO to advance an additional $1 million line of credit. (Ex. B3 [Richert Tr. at 185:20-186:23; 193:23-194:25.)

41.     On March 18, 2015, Danny Letsinger advised Garbrecht that ABL was seeking an additional $1 million seasonal line from BMO. (Ex. B2 [Garbrecht Tr.] at 175:10-176:7; Ex. P.) Garbrecht responded, "Perfect, payable to Richert." (*Id*.)

42.     On or about May 8, 2015, BMO executed that certain credit agreement (the "Second Credit Agreement") memorializing the $1 million seasonal line to ABL, which was funded at closing. (Ex. A ¶¶ 12, 13; Ex. A7.) On or about May 11, 2015, the business day after the seasonal line closed, ABL wrote checks dated May 11 to Richert Funding totaling $1,432,825.00. (Ex. A ¶¶ 22, 23; Ex. A9.) Those checks cleared into Richert Funding's bank account between May 15 and May 27. (*Id*.)

**ABL defaults on its loan obligations and leaves a $2,958,482.10 overadvance.**

43.     BMO advanced the requested funds to ABL in accordance with the Credit Agreements. (Ex. A ¶¶ 5, 13.)

44.     On or about August 14, 2015, BMO was advised that ABL had been kiting checks and took steps to freeze ABL's accounts with the bank. (Ex. B4 [Wickman Tr.] at 83:9-85:8; Ex. A ¶ 21.) ABL's account was left in an overadvance position of $2,958,482.10. (Ex. A ¶ 22; Ex. A9.)

45.    On September 8, 2015, BMO delivered to ABL a notice of default under the First and Second Credit Agreements and accelerated ABL's payment obligations. (Ex. A10.)

46.    ABL's defaults under the Credit Agreements include, without limitation:

(a)    Failure to make the August 2015 monthly payments or any payments thereafter in violation of Section 7.1(a) of the Credit Agreements. (Ex. A ¶ 24.)

(b)    Transferring ABL's accounts receivable to Richert Funding in violation of Section 4.12 and 7.1(d) and (e) of the Credit Agreements. (Exs. C, E.)

(c)    Granting to Richert Funding liens on ABL's assets in violation of Sections 1.1(g), 1.1(h), 3.1(b), 3.2(f), 4.11, 6.1, 7.1(d), and Schedule 4.11 of the Credit Agreements. (Ex. I § 8.1.)

(d)    Using proceeds of BMO's loan to subsequently pay Richert Funding at least $10,183,342.84 without having repaid all of Richert Funding's outstanding indebtedness at the close of the initial loan to ABL in violation of Section 5.9 and 7.1(e) of the Credit Agreements. (Ex. A ¶¶ 26, 27; Ex. A12.)

47.    ABL's outstanding obligations under the Credit Agreements include the following:

(a)    $3,717,044.81, principal amount under the First Credit Agreement. (Ex. A, ¶ 8; Ex. A4.)

12

(b)    $968,677.47, interest amount as of September 6, 2017. (*Id.*)

(c)    $190,254.04, certain fees as of September 6, 2017; these fees are exclusive of BMO's litigation attorney's fees and expenses, which BMO reserves the right to prove up at a later hearing. (*Id.)*

(d)    $1,000,000, principal amount under Second Credit Agreement. (Ex. A, ¶ 14; Ex. A8.)

(e)    $220,871.56, interest amount as of September 7, 2017. (*Id.*)

(f)    $2,958,482.10, total overdraft amount. (Ex. A, ¶ 22; Exs. A1 and A7 § 5.2; Ex. A9.)

(g)    $1,270,676.38, interest on overdraft amount. (Ex. A, ¶ 22; Ex. A11.)

(h)    $3,311,464.66 in PACA lien claims, exclusive of PACA plaintiffs' attorney's fees and expenses. (*Evergreen et al. v. Richert Funding, LLC et al.*, No. 1:15-CV-03171-AT (N.D. Ga.) (D.E. #428-1); Exs. A1 and A7 §§ 5.2, 5.5.)

(i)    BMO's attorney's fees and expenses in this litigation and the related PACA case in an amount to be proven up. Exs. A1 and A7 §§ 5.2, 5.5.)

## Richert Funding records its lien on all of ABL's assets and files suit under the Secret Factoring Agreement

48.    On September 22, 2015, Richert Funding recorded a UCC financing statement, as File Number 201505086084 with the Florida Department of State,

124111940

perfecting its October 15, 2014 security interest in all assets of ABL. (Ex. Q.)

49.     On October 2, 2015, Richert Funding filed a complaint against Aaron Letsinger in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "State Complaint"). (Ex. E.)

50.     On October 4, 2015, Richert Funding filed a complaint against Jonathan Letsinger, Robert Letsinger and Sharon Letsinger in the United States District Court for the Middle District of Florida (the "Federal Complaint," collectively, the "Richert Guaranty Actions"). (Ex. C.)

51.     Richert Funding admits in the Richert Guaranty Actions that Richert Funding and ABL Farms entered into the Secret Factoring Agreement on October 15, 2014, seven days prior to BMO loan payoff; ABL Farms offered for sale and Richert Funding purchased all of ABL's rights, title and interest in and to ABL's accounts receivable by making purchase price advances to ABL; and Richert Funding made demands on ABL Farms regarding the Secret Factoring Agreement and in connection with the ABL Accounts. (Ex. E at ¶¶ 8, 10, 11; Ex. C at ¶¶ 14, 16, 17.)

52.     Prior to the filing of the Richert Guaranty Actions, BMO had no idea that ABL had been selling its accounts receivable to Richert, that Richert continued to factor ABL's invoices, or that Richert had been receiving in excess of $10 million in ABL funds that it did not hold in trust or turn over to BMO. (Ex. A, ¶ 19.)

53.     Richert has refused to turn over ABL's accounts receivable, or the proceeds therefrom, to BMO. (Ex. A, ¶ 20.)

14

Dated this <u>6th</u> day of December 2020.

Respectfully submitted,

*/s/  Juliane M. Brumbaugh*
Michael A. Nardella, Esq.
Florida Bar No.: 51265
Juliane M. Brumbaugh, Esq.
Florida Bar No. 113366
Nardella & Nardella, PLLC
135 W. Central Blvd., Suite 300
Orlando, FL 32801
(407) 966-2680
jbrumbaugh@nardellalaw.com
service@nardellalaw.com

**COUNSEL    FOR    PLAINTIFF,    BMO
HARRIS BANK, N.A.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this <u>6th</u> day of December 2020, a true and correct copy of the foregoing has been served via electronic mail to all parties registered to receive notices via CM/ECF.

*Juliane M. Brumbaugh*
Juliane M. Brumbaugh, Esq.

124111940