ORDERED.

**Dated:  July 21, 2021**

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| Dwight Donald Richert and | ) | Case No. 6:19-bk-00179-KSJ |
| Holly Berry Richert, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| BMO Harris Bank, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 6:19-ap-00260-KSJ |
| | ) | |
| Dwight Donald Richert, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
## FINDING DEBT NOT DISCHARGEABLE

Debtor and Defendant, Dwight Richert, is a self-reliant and confident
businessman who started an accounts receivable factoring company called Richert
Funding, LLC ("R/Funding"). Debtor was the 100% owner and made every

important operational decision for R/Funding. Its largest customer was A.B.L. Farms ("ABL"), a watermelon broker. Over a short period, ABL's debt to R/Funding climbed from $50,000 to over $8 million. When ABL acknowledged it could not pay its debts, Richert colluded with ABL's insiders to convince Plaintiff, BMO Harris Bank, N.A. ("BMO"), to lend ABL almost $5 million, most of which was used to pay R/Funding's debt. BMO approved this loan justifiably relying on the intentionally false representations made by Richert—that ABL's accounts receivable were current and plentiful, and that the BMO loan would pay R/Funding in full.

After ABL's watermelon business spectacularly failed in less than one year, just as Richert anticipated, BMO suffered a multimillion-dollar loss which they argue in this adversary proceeding is attributable to Richert's back-room manipulations and direct lies and is not dischargeable in this Chapter 7 bankruptcy case under § 523(a)(2)(A), (4), and (6) of the Bankruptcy Code.[1] I agree that under § 523(a)(2)(A) Richert remains liable to BMO and will enter a nondischargeable judgment against him for the amount of $6,068,896.68, plus post-judgment interest.

### *Richert Loans ABL $8 million*

Richert owned 100% of R/Funding, an accounts receivable factoring business, and made every important decision for the business.[2] The factoring business gives businesses with limited financial histories and big cash needs a way to operate,

---

[1] All references to the Bankruptcy Code refer to 11 U.S.C. § 101, *et. seq.*

[2] Trial Tr. vol. 1, 104:10-16. The trial occurred on February 8 and 9, 2021. The trial transcript was filed on February 23, 2021. Doc. No. 75 (vol. 1); Doc. No. 76 (vol. 2). All "Doc. No." citations refer to pleadings filed in Adversary Proceeding 6:19-ap-00260-KSJ unless otherwise noted.

optimistically to bridge the gap between imminent failure and profitability. R/Funding was a typical factoring company buying customers' accounts receivable (i.e., invoices) at a discount[3] and advancing a percentage of the face value of the invoice to the client. When each invoice is paid, R/Funding receives the payment, subtracts a fee, and then sends the remaining balance to the client.[4] Generally, factoring accounts receivable is one of the most expensive ways to borrow monies.

Debtor was involved in every aspect of R/Funding's operations. R/Funding had few employees, including Bart Garbrecht, Vice President of Sales, and Laura Jessee, all of whom reported directly to Richert. Debtor made every significant decision for R/Funding.[5]

In 2011, Garbrecht got a tip to call ABL as a potential client.[6] ABL was a wholesale watermelon broker buying watermelons from producers and selling them to larger retailers.[7] Two brothers ran ABL—Aaron Letsinger was the owner and President of ABL;[8] "Danny" Letsinger was Vice President and managed ABL's daily operations.[9] As will become more important in ABL's collapse, Danny Letsinger also owned a separate company, Southern Melon Distributors, Inc. ("Southern Melon"),

---

[3] Trial Tr. vol. 1, 33:1-6.
[4] Bart Garbrecht Dep. 6:24-7:20.
[5] Trial Tr. vol. 1, 104:17-105:13, 163:15-21.
[6] Dwight Richert Dep. 75:10-76:13. The customer lead originated from a BMO relationship manager, Brian Wickman. Mr. Wickman referred ABL to the Debtor and R/Funding. Trial Tr. vol. 1, 69:21-70-3, 71:19-22.
[7] Trial Tr. vol. 1, 33:12-19, 70:4-12.
[8] Trial Tr. vol. 1, 75:22-24; Pl.'s Ex. 3, at 12, 13.
[9] Doc. No. 35-1, at 2; Doc. No. 41, at 3.

an affiliate of ABL that purchased and sold watermelons to ABL and other companies.[10]

Garbrecht convinced the Letsinger brothers to factor ABL's accounts receivables with R/Funding. In October 2011, R/Funding and ABL signed their first Factoring and Security Agreement (the "2011 Factoring Agreement").[11] R/Funding took an ownership interest in ABL's accounts receivables and a security interest in the business's other collateral.[12] Under the agreement, R/Funding also provided ABL with other financing including purchase order funding and grower advances.[13] R/Funding properly perfected its ownership interest in the purchased accounts and its first priority security interest in all collateral by filing a UCC-1 Financing Statement.[14]

So, in 2011, R/Funding owned all of ABL's accounts receivable and had a first position blanket lien on its other assets. R/Funding also performed accounting services for ABL keeping financial records on ABL's receivables, essentially acting as the "back office."[15] R/Funding (not ABL) would create reports tracking the creation and collection of ABL's receivables, including preparing critical aging reports.[16] These aging reports determined how much R/Funding would advance to ABL and reflected

---

[10] Doc. No. 35-1, at 3; Doc. No. 41, at 4.
[11] Trial Tr. vol. 1, 107:21-109:6; Pl.'s Ex. 3.
[12] Trial Tr. vol. 1, 109:7-16; Pl.'s Ex. 3, at 2. The fees associated with the agreement included factoring fees, misdirect payment fees, missing notation fees, out-of-pocket expenses, and possible late charge fees. Trial Tr. vol. 1, 109:23-110:6; Pl.'s Ex. 3, at 6.
[13] Trial Tr. vol. 1, 172:5-11. A purchase order is a commitment from a company to buy a product or service. For purchase order funding, R/Funding would give ABL enough money to fund a customer's purchase order. For a grower advance, R/Funding would extend funds to ABL, which they then extended to watermelon growers (farmers) "for seed, plowing, water, irrigation, [and] harvesting." Trial Tr. vol. 1, 172:12-16, 173:4-12.
[14] Def.'s Ex. 2.
[15] Dwight Richert Dep. 126:7-14; Trial Tr. vol. 1, 165:16-166:8.
[16] Trial Tr. vol. 1, 34:24-35:5, 168:18-169:3; Danny Letsinger Dep. vol. 1, 58:25-60:7.

outstanding invoice amounts, the advance date, and the age of the invoice.[17]    As we will learn later, in September 2014, R/Funding falsified the information on these aging reports it prepared to convince BMO to lend monies to ABL.

R/Funding initially advanced $50,000 to ABL,[18] but that amount soon swelled; by July 2014, ABL owed R/Funding over $8 million.[19] Because R/Funding kept ABL's financial records and controlled ABL's cash flow,[20] Richert also knew ABL was failing and could not repay this huge debt of $8 million.

Richert knew ABL was not collecting its accounts receivable promptly.[21] Receivables should typically be collected within 30 days; however, the average age of ABL's receivables was 37 days old and only 19-20% were collected within 30 days; it also appeared that most receivables "were not valid [i.e., collectible]."[22] On July 9, 2014, Danny Letsinger directly told Richert that ABL was "flat broke."[23]

Richert rightfully was concerned ABL could not repay R/Funding. ABL was financially failing, perhaps in part due to the cost of borrowing monies from R/Funding. Richert told the Letsinger brothers he would "help" them be more successful by getting a conventional line of credit from a traditional lender.[24] ABL started exploring refinancing options, including getting a loan from BMO.[25] From

---

[17] Trial Tr. vol. 1, 36:3-15, 169:4-18.
[18] Dwight Richert Dep. 76:4-13.
[19] Trial Tr. vol. 1, 110:13-16.
[20] Matthew Chapman Dep. 43:24-44:24.
[21] *See* Trial Tr. vol. 1, 47:13-51:9.
[22] Trial Tr. vol. 1, 47:13-51:9.
[23] Trial Tr. vol. 1, 110:13-112:1.
[24] Dwight Richert Dep. 135:13-25.
[25] Danny Letsinger Dep. vol. 1, 77:11-78:25.

there, ABL and Defendant concocted a well-planned and executed scheme to make sure that ABL received a loan that would repay R/Funding some (but not all) of these amounts due.

### *Richert Colludes with ABL to Convince BMO to Extend Loan*

In late 2013, Brian Wickman, the BMO officer who originally referred ABL to R/Funding, resumed talks about BMO extending a loan to ABL.[26] Wickman started ABL's application process for a $5 million loan from BMO in early 2014.[27] Richert coached Danny Letsinger through these conversations with BMO's representatives so ABL could get enough money for a "partial pay-down" to R/Funding.[28] Richert was laser focused on getting ABL fresh capital, primarily to pay R/Funding.

At first, BMO turned downed ABL's loan request. Although Wickman and David Maraman, Wickman's supervisor and a regional BMO manager, recommended the ABL loan,[29] Gary Nowak, a credit manager for BMO, said "no."[30] Maraman challenged this answer going directly to Nowak's supervisor, Jack Yong, BMO's senior credit manager for business banking, for approval.[31] Yong agreed with Nowak. BMO rejected ABL's first loan application.[32]

---

[26] Trial Tr. vol. 1, 71:6-16, 71:23-72:3.
[27] Trial Tr. vol. 1, 72:2-3.
[28] *See* Dwight Richert Dep. 133:13-134:10.
[29] Trial Tr. vol. 1, 92:18-93:3; Gary Nowak Dep. 20:23-21:2, 22:2-23:19.
[30] Trial Tr. vol. 1, 93:4-10; Gary Nowak Dep. 16:24-17:3, 22:13-24.
[31] Trial Tr. vol. 1, 93:11-19; Gary Nowak Dep. 22:13-24; Jack Yong Dep. 5:6-9.
[32] Trial Tr. vol. 1, 93:20-25; Jack Yong Dep. 21:7-13.

Yong, however, suggested the parties explore another financing option using a Small Business Administration ("SBA") loan, where the federal government would guarantee 75% of the loan.[33] ABL agreed to pursue a SBA loan.

Richert directly assisted in this process. He or his staff at R/Funding worked with ABL to ensure ABL's financial information on this second loan application appeared more positive. This is the step where Richert went from merely coaching the Letsinger brothers, hoping to get R/Funding repaid, to actively falsifying the information that he, R/Funding, and ABL gave to BMO. Richert realized ABL needed to show BMO a rosier financial future to get the new money; Richert delivered this sunnier package, as I will discuss in the next section, and Yong/ BMO ultimately approved the loan.[34]

### *Richert Falsified ABL's A/R Aging Reports to Deceive BMO*

BMO agreed to lend ABL about $5 million as an asset-based loan taking ABL's accounts receivable ("A/R") as collateral.[35] In an asset-based loan, a *borrowing base* is the floor for how much money a lender will loan a company based on the *value* of the collateral.[36] Newer A/R are worth more than older, disputed, or uncollectible A/R. So, the accuracy of the information about a borrower's A/R (as certified by the borrower) is critical to determine how much money a lender advances.[37] Aging reports

---

[33] Jack Yong Dep. 13:1-8; Trial Tr. vol. 1, 94:1-13.
[34] Trial Tr. vol. 1, 94:4-13.
[35] Trial Tr. vol. 1, 81:24-82:7.
[36] Trial Tr. vol. 1, 27:8-17.
[37] Trial Tr. vol. 1, 23:17-28:17; David Maraman Dep. vol. 1, 93:17-95:3.

help lenders verify the computation on the borrowing base certificate and assess whether the A/R qualify as eligible collateral.[38]

To get BMO's approval for the loan, ABL had to establish its borrowing base through aging reports listing outstanding A/R and that its customers were timely paying these invoices. Richert and his staff at R/Funding prepared these aging reports for ABL, and, without doubt, Richert and his people manipulated ABL's aging reports to present BMO with a more promising financial picture for ABL than existed.

Danny Letsinger told Wickman that R/Funding would prepare the aging reports BMO needed because R/Funding had the most up-to-date and accurate information.[39] Two aging reports were provided to BMO: one dated September 22, 2014,[40] prepared by R/Funding; and one dated September 30, 2014, whose origin is unclear but was based on the aging report of September 22, 2014.[41]

I note that on the same day R/Funding was preparing the fictitious aging reports for BMO, Richert was telling Danny Letsinger to apply incoming customer payments to *older* disputed invoices rather than to the *current* invoices the customer agreed was due.[42] The effect of this deception is to make ABL's overall A/R appear more current and valuable when calculating the borrowing base for BMO's anticipated loan.

---

[38] *See* Trial Tr. vol. 1, 74:7-75:4.
[39] Trial Tr. vol. 1, 74:13-20.
[40] Trial Tr. vol. 1, 74:7-16; Pl.'s Ex. 9; Pl.'s Ex. 10.
[41] Trial Tr. vol. 1, 97:24-98:10; Matthew Chapman Dep. 91:18-96:5, 99:8-12, 113:16-114:16.
[42] Pl.'s Ex. 11.

Using the aging report of September 30, 2014, [43] BMO prepared its borrowing base certificate and agreed BMO initially would lend ABL $4,557,192.[44] The amount was calculated by valuing 80% of eligible A/R not over 120 days.[45] Therefore, by manipulating the application of customer payments to older disputed A/R, ABL increased the amounts of monies BMO agreed to lend to ABL. This would "overstate" and "denigrate the quality of the aging report" by removing a receivable that is potentially "in dispute or is not valid with the customer and will never get paid." [46] Richert understood this impact when he told Danny Letsinger to do just that on September 22, 2014.[47]

Both aging reports, however, contain other suspicious "errors." As to the September 22 aging report, several A/R were "rebilled" or "re-aged"—where an existing A/R was replaced with a new one to give it a more current due date to purposefully overstate the value and quality of the A/R.[48] This re-aging was prohibited by BMO, and based on the credible testimony of BMO's expert, there is no legitimate purpose for re-aging.[49] The aging report also included A/R subject to setoffs, which

---

[43] Trial Tr. vol. 1, 97:15-19. Matthew Chapman Dep. at 99:1-7; David Maraman Dep. vol. 1, 186:4-18.

[44] Matthew Chapman Dep. at 99:1-7.

[45] Trial Tr. vol. 1, 61:1-4; Pl.'s Ex. 1.

[46] Trial Tr. vol. 1, 44:11-20.

[47] Trial Tr. vol 1, 45:3-4, 46:21-23. This type of manipulation was evidenced by an email exchange that took place on September 14, 2014 between Jessee, a R/Funding employee, and Richert; Jessee asked, "Not sure how much you want to have applied to items over 60 & how much to apply to [GRS Brokerage]." Pl.'s Ex. 18; *see also* Trial Tr. vol. 1, 45:5-46:23.

[48] Trial Tr. vol. 1, 38:21-39:11.

[49] David Maraman Dep. vol. 2, 753:17-755:4; Trial Tr. vol. 1, 44:5-10.

was prohibited by BMO.[50] And, the aging report included advances to growers which BMO did not consider a qualified A/R.[51]

Although there were differences between the two aging reports, the September 30 report appears to rely on the September 22 report "with some adjustments."[52] The "errors" or misrepresentations cited above appear in both reports.

And, because R/Funding, as ABL's backroom, maintained the financial records for ABL's A/R and typically prepared its reports, I specifically conclude that Richert and R/Funding directly assisted ABL in preparing both fictitious aging reports that paint a much sunnier financial picture than existed at ABL. Richert had a clear interest in making sure that ABL received the largest loan possible from BMO to pay ABL's debt to R/Funding. Richert directly manipulated ABL's A/R on the aging reports by intentionally overstating the value and currency of ABL's A/R to convince BMO to lend more money to ABL.

### *Richert Mispresented BMO's Loan Would Completely Payoff ABL's Debt to R/Funding*

As a condition to the BMO loan, ABL had to pay R/Funding in full, and R/Funding had to release any security interest in ABL's collateral.[53] Richert understood this requirement.

---

[50] Trial Tr. vol. 1, 47:1-7. A "setoff" is when a customer has lent money or has an invoice that it could use to set off the amount they are owed against that receivable. Trial vol. 1, 30:19-31:12.
[51] Trial Tr. vol. 1, 47:8-12.
[52] Trial Tr. vol. 1, 61:17-21. The discrepancies included some accounts being re-aged from the September 22 to the September 30 report. *See* David Maraman Dep. vol. 1, 185:3-194:8.
[53] Trial Tr. vol. 1, 79:6-19, 82:25-83:4; Pl.'s Ex. 1 ¶¶ 3.1, 5.9.

When the loan closed, on October 22, 2014, ABL owed R/Funding and its sister company, GRS Brokerage,[54] approximately $5.4 million. Danny Letsinger told Richert BMO would only pay R/Funding $3.89 million, about $1.4 million short of the total due. Richert was pleased to accept the "payoff," knowing it did not fully pay R/Funding and understanding that BMO would not have made the loan if Richert were truthful. R/Funding was so eager to receive the money from BMO he or Garbrecht would contact Danny Letsinger up to fifteen times a day to check on the status of the payoff.[55] They were desperate to get the $3.89 million from BMO.

Richert and the staff at R/Funding intentionally deceived BMO in confirming the $3.89 million payment would pay R/Funding in full. On October 20, 2014, two days before the loan closing, Garbrecht spoke with Sean Dudley, BMO's attorney, and told him that the payoff amount of $3.89 million "would be fine."[56] Dudley then sent Garbrecht an email with a draft payoff letter.[57]

Yet, that same day, Garbrecht was telling ABL how R/Funding could "settle up" the remaining balance due after receiving the $3.89 million from BMO. Garbrecht sent Danny Letsinger an email stating that the current "payoff [to R/Funding] is $4,886,610.48" and that "[a]fter [BMO] wire hits tomorrow, I will recalculate and Dwight [Richert] will settle invoices and give you an amount for the note, along with

---

[54] Trial Tr. vol. 1, 135:11-16; Pl.'s Ex. 12; Pl.'s Ex. 13; Pl.'s Ex. 14. In 2012, Defendant became a majority owner in GRS Brokerage; in 2014, Garbrecht and Danny Letsinger became part owners. Dwight Richert Dep. 79:25-80:22. GRS Brokerage brokered trucking relationship for companies, including ABL, that needed to get its products from the grower to the retailers. Trial Tr. vol. 1, 190:13-19.

[55] Danny Letsinger Dep. vol. 1, 119:21-120:23.

[56] Bart Garbrecht Dep. 130:2-131:3.

[57] Pl.'s Ex. 15; Trial Tr. vol. 1, 129:24-130:10.

weekly payments."[58] So, before the loan ever closed and without telling BMO, Richert already was working on arrangements for ABL to pay the balance still due to R/Funding.

On October 21, 2014, the day before the BMO loan closing, Wickman at BMO sent Garbrecht an email stating: "We will be sending you a wire for the full [$]3,890,000. This pays you off in full correct?"[59] Before responding, Garbrecht emailed Richert, who was vacationing in Italy.[60] Richert sent Garbrecht a carefully worded, intentionally misleading response to forward to BMO stating: "Yes, we agree to the amount to release UCC and letter of redirection."[61] Notably, Richert omitted stating that BMO's payment would pay R/Funding in full.

Richert also reviewed BMO's Loan Payoff Agreement saying it looked "fine" to him.[62] At Richert's specific direction,[63] Garbrecht signed and delivered to BMO the Loan Payoff Agreement stating, in part, that R/Funding's loan to ABL "including but not limited to all principal, interest, fees, costs and expenses, has been repaid and satisfied in full."[64] This was a total and complete lie. ABL still owed R/Funding and GRS over $1.4 million. And BMO would never have extended this loan if they knew of this remaining debt. Richert knowingly made false and misleading statements to

---

[58] Pl.'s Ex. 14.
[59] Trial Tr. vol. 1, 78:10-79:12; Pl.'s Ex. 16.
[60] Trial Tr. vol. 1, 181:4-19.
[61] Trial Tr. vol. 1, 125:8-127:22; Pl.'s Ex. 16; Pl.'s Ex. 17.
[62] Trial Tr. vol. 1, 129:2-131:14.
[63] Bart Garbrecht Dep. 140:22-141:7; Trial Tr. vol. 1, 132:7-20.
[64] Pl.'s Ex. 18; Trial Tr. vol. 1, 80:24-83:2.

induce BMO to extend the loan to ABL.[65] Upon receiving the payoff, Richert told Garbrecht: "We did real good!"[66]

On October 22, 2014, ABL and BMO executed a credit agreement for up to $5 million ("First Credit Agreement") and a related security agreement.[67] As part of the initial advance of $4,557,192 and under the Loan Payoff Agreement, R/Funding received the promised $3.89 million.[68]

R/Funding did file a UCC-3 and cancel its lien against ABL's A/R under the 2011 Factoring and Security Agreement.[69] Garbrecht, at Richert's direction, also sent ABL's customers a letter[70] notifying them of the release of their lien on ABL's A/R and stating ABL "will no longer be factoring their invoices."[71] Richert signed this letter confirming his continuing scheme to deceive BMO insofar as Richert had no intention of severing ties with ABL. As discussed in the next section, R/Funding and ABL already had agreed to a secret deal, undisclosed to BMO, to allow R/Funding to continue to factor ABL's A/R *after* BMO made its loan.

### *Richert Hid a Secret Factoring Agreement from BMO*

---

[65] At his deposition, Richert stated that these actions were done while taking Ambien, likely to deflect the inference he was acting with fraudulent intent. Dwight Richert Dep. 162:5-18. I find this explanation implausible. Richert repeatedly had the opportunity to tell BMO the actual amount ABL owed R/Funding, and, at every chance, he lied.
[66] Trial Tr. vol. 1, 136:4-6.
[67] Trial Tr. vol. 1, 26:15-27:17; Pl.'s Ex. 1; Pl.'s Ex. 19. On October 23, 2104, BMO perfected its security interest in ABL's assets, including all accounts receivable, by recording a UCC financing statement. Pl.'s Ex. 24.
[68] Pl.'s Ex. 21.
[69] Trial Tr. vol. 1, 182:12-20; Def.'s Ex. 7.
[70] Trial Tr. vol. 1, 182:16-20; Def.'s Ex. 8.
[71] Def.'s Ex. 8.

In August 2014, a couple of months before the BMO loan closed, Richert personally emailed Danny Letsinger saying: "I do not know how to get comfortable with having my personal money out to you and only receiving a second position in terms of collateral."[72] Richert then offered to continue his financing of ABL if the entire Letsinger family would pledge their personal assets, stating: "I could continue to be your source of funding, I just need more of a comfort level at the end of the day and below are some thoughts." Among those "thoughts" was a "[n]ew Factoring [A]greement and personal guaranties from your father, brother and wife, and yourself and Sharon."[73]

On October 15, 2014, one week before the BMO loan closed, and without any disclosure to BMO, R/Funding and ABL agreed to a secret, second Factoring and Security Agreement (the "2014 Factoring and Security Agreement").[74] By now, R/Funding knew it would receive $3.89 million from BMO, and ABL would still owe R/Funding and GRS $1.4 million.[75] This unpaid balance was rolled into the new agreement as a term-loan with an 18% interest rate.[76] The 2014 Factoring and Security Agreement was almost identical to the 2011 Factoring and Security Agreement, including R/Funding's agreement to continue factoring ABL's A/R and to receive a security interest in all of ABL's collateral.[77] And, as earlier discussed, this time, the

---

[72] Pl.'s Ex. 8; Trial Tr. vol. 1, 112:3-113:6, 114:10-14.
[73] Pl.'s Ex. 8; Trial Tr. vol. 1, 113:8-114:4.
[74] Pl.'s Ex. 4.
[75] Trial Tr. vol. 1, 135:11-16; Bart Garbrecht Dep. 148:18-24.
[76] Trial Tr. vol. 1, 139:13-19; Pl.'s Ex. 7, at 3; Bart Garbrecht Dep. 128:1-7, 148:18-24.
[77] Trial Tr. vol. 1, 123:20-23; Pl.'s Ex. 4; *see also* Pl.'s Ex. 3.

debt was personally guaranteed by Aaron and Danny Letsinger, along with their father and Danny Letsinger's wife.[78]

Starting on October 29, 2014, one week after the BMO loan closed, R/Funding began collecting $27,500 every week from ABL in repayment for the $1.4 million still owed.[79] In November 2014, R/Funding told its lender, Platinum Bank, that while "ABL did close on a line," R/Funding was "still funding certain deals" and felt "when the season cranks back up they [ABL would] have a larger need for factoring."[80] R/Funding also listed ABL's invoices in the aging report it sent to Platinum Bank after the BMO loan closed.[81]

So, for R/Funding business continued as usual after receiving the $3.89 million from BMO. R/Funding continued to factor ABL's A/R, as reflected in the financial information sent to Platinum Bank. R/Funding collected over $100,000 every month from ABL, and now had the personal guarantees of the Letsinger family as further security under the 2014 Factoring and Security Agreement. BMO had no knowledge this secret deal existed.

### *Richert Fashions a Spot Factoring Scheme*

In March 2015, Richert encouraged Danny Letsinger to seek an additional $1 million credit line from BMO.[82] Richert knew BMO was not interested in R/Funding

---

[78] Dwight Richert Dep. 124:7-125:22; Pl.'s Ex. 6, at 5-9.
[79] Trial Tr. vol. 1, 137:13-16; 148:1-6.
[80] Pl.'s Ex. 25. During this period, Richert Funding had a line of credit with Platinum Bank; in exchange for certain pledged assets, it was able to borrow a revolving facility up to $8 million. Trial Tr. vol. 1, 140:18-22.
[81] Trial Tr. vol. 1, 147:7-25; Pl.'s Ex. 31; Dwight Richert Dep. 34:4-35:16, 180:21-182:23.
[82] Trial Tr. vol. 1, 149:9-15.

remaining a "subordinated lender";[83] however, ABL was R/Funding's "largest commission." He told Danny Letsinger they were "partners," and he wanted to continue funding.[84] So, in April 2015, Richert sent ABL a special factoring rate sheet that included an interest rate of 1% for "spot factoring" for a period of one to seven days.[85] Neither ABL nor Richert told BMO about this new factoring arrangement.

So, Richert, who is trying to get an extra million from BMO, simultaneously is offering his ABL "partner" the atrocious deal of factoring its A/R for 1% per week, equivalent to 52% per year. The only beneficiary of this increased funding was R/Funding.

On May 8, 2015, BMO executed a seasonal line of credit agreement with ABL for $1 million (the "Second Credit Agreement").[86] After receiving these new borrowed monies from BMO, on May 11, ABL wrote checks to R/Funding totaling $1,432,825.[87] In total, R/Funding received monies from BMO totaling $5,322,825.

Between June and August 2015, R/Funding continued to "spot factor" ABL's invoices.[88] And between October 2014 and August 2015, R/Funding advanced over $9.5 million to ABL.[89] During this period, ABL paid R/Funding over $10 million.[90] ABL's operations soon collapsed under the weight of its debts to R/Funding.

---

[83] Dwight Richert Dep. 120:12-121:6.
[84] Trial Tr. 114:5-14; Pl.'s Ex. 8.
[85] Trial Tr. vol. 1, 149:16-150:1. This 1% interest equates to 52% annum. Trial Tr. vol. 1, 34:14-16.
[86] Trial Tr. vol. 1, 77:18-78:3; Pl.'s Ex. 2 at 1-49. A security agreement was also executed that day. Pl.'s Ex. 2, at 49-56.
[87] Trial Tr. vol. 1, 53:17-19.
[88] Dwight Richert Dep. 69:6-19; Pl.'s Ex. 6 ¶ 10; Trial Tr. vol. 1, 149:16-150:1.
[89] Trial Tr. vol. 2, 270:22-271:18.
[90] Trial Tr. vol. 1, 55:1-8; Trial Tr. vol. 2, 270:3-271:10.

### *ABL's Check Kiting Scheme and Collapse*

In August 2015, BB&T Bank, which had a lending relationship with Danny Letsinger's company, Southern Melon, discovered an ongoing check kiting scheme between ABL and Southern Melon.[91] The two Letsinger companies were writing checks against each other's accounts and depositing them back and forth between the two banks—BB&T and BMO—to have sufficient funds to pay the checks from each account.[92] BMO was alerted to the check kiting scheme; ABL's accounts were frozen.[93] Due to overdrafts, ABL's account was left in an over-advance position of approximately $2.5 million.[94] ABL stopped paying R/Funding.[95] The business closed.

On September 8, 2015, BMO sent a notice of default to ABL under the First and Second Credit Agreements.[96] A few days later, on September 22, 2015, R/Funding recorded (*for the first time*) its UCC Financing Statement perfecting its blanket lien on ABL's assets, including its A/R, under the secret 2014 Factoring and Security Agreement.[97]

Richert kept his lien secret from BMO until *after* ABL's business closed and BMO had declared a default. Richert later stated that the UCC financing statement was filed "inaccurately" and withdrew it;[98] Richert's explanation is not credible. He

---

[91] Trial Tr. vol. 1, 86:23-87:21, 99:24-100:10, 249:9-25.
[92] Trial Tr. vol. 1, 87:15-21, 240:9-244:2.
[93] Trial Tr. vol. 1, 87:2-14.
[94] Trial Tr. vol. 1, 204:2-13; Pl.'s Ex. 35-9.
[95] Trial Tr. vol. 1, 154:17-24. ABL already had stopped making the weekly payments of $27,500 in the spring. Trial Tr. vol. 1, 148:1-16.
[96] Pl.'s Ex. 35-10.
[97] Pl.'s Ex. 34; Trial Tr. vol. 1, 157:10-158:9.
[98] Dwight Richert Dep. 63:23-64:11.

intentionally kept the lien secret from BMO and always intended to preserve R/Funding's secured position in ABL's collateral based on the 2014 Factoring and Security Agreement.

Richert Funding then sued Aaron Letsinger in Florida state court and, in federal district court, sued Danny Letsinger and the other guarantors of the 2014 Factoring and Security Agreement.[99] In these complaints, Richert stated that "[b]etween June 17, 2015, and August 10, 2015, ABL offered for sale and Richert [Funding] purchased, all of ABL's rights, title and interest in and to ABL's accounts receivable by making purchase price advances to ABL."[100]

Richert later dismissed the lawsuits "at the advice of counsel" because "there was a long line of people in front of [R/ Funding] to make claims that had secured positions, and [R/Funding] had no secured position."[101] Ultimately, Richert probably realized, by filing the lawsuits and the UCC Financing Statement, he was admitting his misrepresentations to BMO. He finally may have realized the consequences of his deceit but that does not alter my conclusion that Richert knowingly misrepresented ABL's remaining indebtedness to R/Funding and the quality of ABL's A/R.

### *Post-Default Litigation and Bankruptcies*

---

[99] Trial Tr. vol. 1, 154:25-156:2; Pl.'s Ex. 5; Pl.'s Ex. 6.
[100] Trial Tr. vol. 1, 154:17-157:9; Pl.'s Ex. 5 ⁋ 16; Pl.'s Ex. 6 ⁋ 10.
[101] Dwight Richert Dep. 69:25-70:4.

On September 30, 2015, in related litigation in federal district court,[102] BMO got a stipulated consent judgment against ABL for $12,168,589.45 (the "BMO Judgment").[103] So, in less than one year after the BMO loan to ABL closed on October 22, 2014, ABL agreed to a judgment against it of over $12 million. Of that amount, R/Funding received $5,322,825.

In November 2015, BMO separately sued Richert, R/Funding, and Garbrecht.[104] BMO alleged fraud, fraudulent inducement, civil conspiracy to commit fraud, conversion, civil conspiracy to commit conversion, tortious interference, and unjust enrichment.[105] Before any judgment was entered, this litigation was stopped by the automatic stay imposed in two bankruptcy cases[106]—one filed against R/Funding and the other filed by Richert and his wife.

In the first bankruptcy proceeding, creditors filed an involuntary Chapter 7 liquidating petition against R/Funding in October 2018.[107] Richert and his wife then individually filed for Chapter 11 bankruptcy in January 2019.[108] The two cases were

---

[102] Compl., *Evergreen Farms & Produce, LLC v. ABL Farms, Inc.*, No. 1:15-cv-3171-MLB (N.D. Ga. Sept. 9, 2015), ECF No. 1.
[103] Pl.'s Ex. 37; J. in Favor of BMO, *Evergreen Farms & Produce, LLC v. ABL Farms, Inc.*, No. 1:15-cv-3171-MLB (N.D. Ga. Sept. 5, 2018), ECF No. 527.
[104] Compl., *BMO Harris Bank, N.A. v. Richert Funding, LLC*, No. 1:15-cv-03886-MLB (N.D. Ga. Nov. 6, 2015), ECF No. 1.
[105] *Id.*
[106] Order, *BMO Harris Bank, N.A. v. Richert Funding, LLC*, No. 1:15-cv-03886-MLB (N.D. Ga. Jan. 30, 2019), ECF No. 211.
[107] Involuntary Pet. Under Chapter 7, *In re Richert Funding, LLC*, No. 6:18-bk-06276-KSJ (Bankr. M.D. Fla. October 11, 2018), ECF No. 1.
[108] Voluntary Pet. Under Chapter 11, *In re Richert*, No. 6:19-bk-00179-KSJ (Bankr. M.D. Fla. Jan. 10, 2019), ECF No. 1.

substantively consolidated, and Richert's individual case was converted to Chapter 7 under 11 U.S.C. § 1112(a).[109]

### *BMO's Claims*

BMO filed this adversary proceeding seeking a monetary judgment and determination of non-dischargeability under § 523(a)(2)(A), (4), and (6) of the Bankruptcy Code.[110] "Section 727 of the Bankruptcy Code provides that a debtor in a chapter 7 case shall receive a discharge from all of his debts which arose before the date of the order for relief, unless one of the specified conditions set forth in that section is present."[111] Section 523 contains exceptions to the general discharge, and § 523(a) "sets forth several categories of debts which are excepted from the discharge."[112] Plaintiff must prove non-dischargeability under § 523(a) by a preponderance of the evidence.[113]

BMO's claims against Richert remain pending and are unliquidated. BMO timely filed its Proof of Claim 27-1 relying on the BMO Judgment—$12,631,462.55. But Richert was not a party in the litigation against ABL. Therefore, because the debt

---

[109] Order Granting Mot. to Convert Case to Chapter 7, *In re Richert*, No. 6:19-bk-00179-KSJ (Bankr. M.D. Fla. Sept. 25, 2019), ECF No. 168. Discharge as to Debtor was entered in January 2020. Discharge of Debtor, *In re Richert*, No. 6:19-bk-00179-KSJ (Bankr. M.D. Fla. Jan. 23, 2020), ECF No. 170.

[110] Doc. No. 1. At the trial on February 8 and 9, 2021, Colin James McClary, Wickman, Richert, Dawn Sparr, and Scott Michael Bouchner testified, and the parties submitted exhibits. Defendant objected to Plaintiff's Exhibit 30; however, the Court overrules the objection. Additionally, the parties have filed deposition designations of Richert, Garbrecht, Danny Letsinger, Yong, Nowak, Maraman, and Matthew Chapman. Defendant objected to portions of the depositions of Defendant, Garbrecht, and Danny Letsinger. Doc. No. 61. The bulk of Defendant's objections relate to relevancy and lack of foundation. The Court concludes the testimony is relevant, the proper foundation was laid and will overrule Defendant's objections *in toto*.

[111] *In re Thompson*, 207 B.R. 7, 9 (Bankr. M.D. Fla. 1996).

[112] *Id.*

[113] *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991); *see also* Fed. R. Bankr. P. 4005.

against Richert (if any) is not liquidated, this Court "must necessarily determine liability and damages in order to establish the underlying debt."[114]

"Debt" is defined as "liability on a claim," § 101(12), and "claim" is defined as a "right to payment," § 101(5)(A). For § 523(a)(2)(A), "debt" means liability on "an enforceable obligation."[115] "Whether a debt exists is determined by looking to applicable law, frequently state law. . . . To establish the validity of the debt under § 523(a)(2)(A), the claimant must establish that the debtor is liable on an enforceable obligation under applicable law, nothing more nor less."[116] And courts have recognized that "a bankruptcy court has the authority to liquidate a state law claim and enter a monetary judgment against a debtor when deciding if that claim/judgment is non-dischargeable in a debtor's bankruptcy case."[117]

### *BMO Fails to State a Claim Under § 523(a)(4) or (6)*

---

[114] *Stanbrough v. Valle (In re Valle)*, 469 B.R. 35, 43 (Bankr. D. Idaho 2012); *accord Drummond v. Freeland (In re Freeland)*, 360 B.R. 108, 129 (Bankr. D. Md. 2006).

[115] *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S. Ct. 1212, 1216 (1998).

[116] *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8-9 (B.A.P. 10th Cir. 2016). Here, the choice of law is murky: ABL and R/Funding were Florida corporations; BMO is a national banking association with its principal place of business in Illinois; some of the underlying events took place in Georgia; and the First and Second Credit Agreements state the agreement would be governed by "the laws of the State of Florida." "Under the diversity jurisdiction approach, bankruptcy courts borrow from the 'law applicable in diversity cases to hold that the forum state's choice of law rules are imposed on bankruptcy adjudications where the underlying rights and obligations are defined by state law.'" *Dzikowski v. Friedlander (In re Friedlander Cap. Mgmt. Corp.)*, 411 B.R. 434, 441-42 (Bankr. S.D. Fla. 2009) (quoting *Marine Midland Bank v. Portnoy (In re Portnoy)*, 201 B.R. 685, 697 (Bankr. S.D.N.Y. 1996)) (citing *In re Eagle Enters., Inc.*, 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998)). Because this Court sits in Florida, Florida's choice of law rules governs the choice of law issue here. A court need only undertake a complete choice of law analysis if a true conflict exists. *Tune v. Philip Morris Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000). A "false conflict" exists when "the laws of different states are (1) the same, (2) different but would produce the same outcome under the facts of the case, or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws." *Id.* Because a false conflict is present, the Court chooses to apply the law of the forum state, Florida. *See Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 n.21 (11th Cir. 1995).

[117] *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011) (citing cases from several Circuit Courts recognizing this proposition), *aff'd sub nom. Carroll v. Farooqi*, 486 B.R. 718 (N.D. Tex. 2013); *accord Old Republic Nat'l Title Ins. Co. v. Vermilio (In re Vermilio)*, 457 B.R. 854, 862 (Bankr. M.D. Fla. 2011).

BMO's arguments that a dischargeable debt exists under § 523(a)(4) or (6) of the Bankruptcy Code fail. Under § 523(a)(4), BMO argues Richert's actions amount to embezzlement or larceny. "Larceny is the fraudulent taking and carrying away of the property of another with intent to convert such property to his use without the consent of another."[118] Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.[119] Under § 523(a)(6), BMO argues Richert's actions amount to conversion. To establish a claim for conversion, a plaintiff must prove: "(1) an act of dominion wrongfully asserted, (2) over plaintiff's property, that is (3) inconsistent with plaintiff's ownership therein."[120]

These claims fail for the same reason—lack of standing. ABL (not BMO) paid the disputed monies to Richert and R/Funding. ABL "owned" and controlled the monies. BMO held a security interest for repayment but had transferred the funds to ABL under the two loans. "[A] mere lien or security interest does not rise to the level of ownership sufficient to support a claim under § 523(a)(4)'s embezzlement

---

[118] *Synod of S. Atl. Presbyterian Church v. Magpusao (In re Magpusao)*, 265 B.R. 492, 498 (Bankr. M.D. Fla. 2001) (citing *Faw v. Wiles (In re Wiles)*, 166 B.R. 975, 980 (Bankr. M.D. Fla. 1994)).

[119] *In re Wiles*, 166 B.R. at 980. "Claims for embezzlement and larceny are similar; the primary difference is that with embezzlement, the defendant initially acquires the property lawfully, while larceny requires that the funds originally come into the defendant's hands unlawfully." *Julian v. Taylor (In re Taylor)*, No. 8:15-ap-684-CED, 2016 WL 116331, at *2 (Bankr. M.D. Fla. Jan. 11, 2016) (citing *Alternity Cap. Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013)).

[120] *Brown v. Vega (In re Vega)*, No. 6:10-ap-00299-KSJ, 2014 WL 2621118, at *4 (Bankr. M.D. Fla. June 12, 2014) (quoting *Bar-Am v. Grosman (In re Grosman)*, No. 6:05-ap-328-KSJ, 2007 WL 1526701, at *16 (Bankr. M.D. Fla. May 22, 2007)).

provision."[121] And the conversion elements "emphasize dominion wrongfully asserted of *plaintiff's* property inconsistent with *plaintiff's* ownership."[122]

Here, the alleged misappropriation concerns funds BMO lent to ABL. Conceivably, *ABL* could assert claims for larceny, embezzlement, or conversion. But *BMO* lacks standing to claim Richert unlawfully took, embezzled, or converted the money it provided to ABL.[123] BMO voluntarily transferred the monies to ABL and, by doing so, lost the ability to pursue its claims under § 523(a)(4) and (6) of the Bankruptcy Code. But, as I will discuss next, BMO succeeds on its claim under § 523(a)(2)(A) of the Bankruptcy Code.

### *Legal Standard Under § 523(a)(2)(A)*

Under § 523(a)(2)(A), a debtor cannot discharge a debt to the extent the debt is obtained by "false pretenses, a false representation, or actual fraud."[124] To prevail, a plaintiff must establish, by a preponderance of the evidence, the traditional elements of common law fraud, including (1) the defendant made a false representation with the purpose and intent to deceive the plaintiff; (2) the plaintiff relied on the misrepresentation; (3) the reliance was justified; and (4) the plaintiff sustained a loss as a result of the misrepresentation.[125] Because the elements and evidence necessary to

---

[121] *Kraus Anderson Cap., Inc. v. Bradley (In re Bradley)*, 507 B.R. 192, 200 (B.A.P. 6th Cir. 2014) (quoting *Hulsing Hotels Tenn., Inc. v. Steffner (In re Steffner)*, 479 B.R. 746, 766 (Bankr. E.D. Tenn. 2012)).
[122] *In re Vega*, 2014 WL 2621118, at *5.
[123] *Id.*; *see also White v. Whittle (In re Whittle)*, 449 B.R. 427, 430 (Bankr. M.D. Fla. 2011).
[124] 11 U.S.C. § 523(a)(2)(A).
[125] *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998); *Fuller v. Johannessen (In re Johannessen)*, 76 F.3d 347, 350 (11th Cir. 1996); *Avren v. Daniel (In re Daniel)*, 613 B.R. 374, 379 (Bankr. M.D. Fla. 2020); *see also Field v. Mans*, 516 U.S. 59, 73-75, 116 S. Ct. 437, 445-46 (1995) (holding that § 523(a)(2)(A) requires justifiable rather than reasonable reliance).

prove fraud under state law are substantially similar to those under § 523(a)(2)(A),[126] with a few exceptions which will be addressed, a plaintiff who proves all elements of § 523(a)(2)(A) also has proven liability for the fraud.[127]

To prove an intent to deceive, "the debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in the law, which may exist without the imputation of bad faith or immorality."[128] Actual fraud precluding discharge "consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design or perpetrating what is known to be a cheat or deception."[129] An analysis determining fraudulent intent often "depends largely upon an assessment of the credibility and

---

[126] Under Florida law, "[t]he essential elements of common-law fraud are: (1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person." *Gandy v. Trans World Comput. Tech. Grp.*, 787 So. 2d 116, 118 (Fla. 2d DCA 2001). Similarly, "[t]he elements of fraudulent misrepresentation and fraudulent inducement are: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Moriber v. Dreiling*, 194 So. 3d 369, 373 (Fla. 3d DCA 2016).

[127] *See Gulf Coast Endoscopy Ctr. of Venice, LLC v. DeMasi (In re DeMasi)*, 542 B.R. 13, 28-29 (Bankr. M.D. Fla. 2015) (recognizing that the main difference is that under state law the plaintiff does not need to prove reliance to prevail on an intentional misrepresentation claim, whereas claims under § 523(a)(2)(A) require justifiable reliance); *In re Vega*, 2014 WL 2621118, at *2 (citing *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 676 (11th Cir. 1993)) ("Indeed, in other contexts, the Eleventh Circuit has determined that the elements of § 523(a)(2)(A) and Florida common law fraud are nearly identical."); *see also Gronewoller v. DM Cap., Inc. (In re Mascio)*, No. 06-cv-01780-PSF, 2007 WL 3407516, at *3-4 (D. Colo. Nov. 13, 2007) (concluding that bankruptcy court's findings on the plaintiff's § 523(a)(2) claim were equivalent to a ruling that the debtor was liable to the plaintiff under Colorado law for false representation and qualified as a "debt" for purposes of § 523(a)).

[128] *FTC v. Juravin (In re Juravin)*, 623 B.R. 343, 346 (Bankr. M.D. Fla. 2020) (quoting *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir. 1986)).

[129] *Id.* (alteration in original) (quoting *Conseco v. Howard (In re Howard)*, 261 B.R. 513, 517 (Bankr. M.D. Fla. 2001)).

demeanor of the debtor."[130] Because a debtor rarely admits fraudulent intent, courts look at the totality of circumstances to make that determination.[131]

A bankruptcy court also may look to the recklessness of a debtor's behavior under the totality of the circumstances.[132] "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the [inference] of intent [to deceive]."[133] Ultimately, it is the plaintiff's burden of proof to prove intent to deceive by a preponderance of the evidence.[134]

Initially, I easily conclude Richert is responsible for all actions of R/Funding and its employees.[135] "In an action for misrepresentation, a principal is liable for the fraud of his agent while acting in the scope of his authority, and this principle of law is fully applicable to corporations."[136] As Richert testified, he owned 100% of R/Funding. He was involved in every aspect of the business. He made all relevant decisions. All employees, including Garbrecht, reported directly to him.[137] Richert and

---

[130] *J. Thompson Invs., LLC v. Soderstrom (In re Soderstrom)*, 524 B.R. 835, 841 (Bankr. M.D. Fla. 2015) (quoting *Rasch v. Shamar (In re Shamar)*, No. 6:11-ap-00231-ABB, 2012 WL 1569565, at *5 (Bankr. M.D. Fla. May 2, 2012)); *see also Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994).

[131] *In re Miller*, 39 F.3d at 304.

[132] *Id.* at 305.

[133] *Id.* (second alteration in original) (quoting *Foote & Davies v. Albanese (In re Albanese)*, 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989)).

[134] *Grogan*, 498 U.S. at 289-91, 111 S. Ct. at 661.

[135] *See Agribank, FCB v. Gordon (In re Gordon)*, 293 B.R. 817, 825-26 (Bankr. M.D. Ga. 2003) (quoting *Love v. Smith (In re Smith)*, 98 B.R. 423, 426 (Bankr. C.D. Ill. 1989)) ("Many courts have found that fraud committed by an agent would render a debt nondischargeable as to a debtor-principal under § 523(a)(2). A debtor who has not himself made any false representation may be responsible for the fraud of an agent acting within the scope of that agent's authority.").

[136] *Taco Bell of Cal. v. Zappone*, 324 So. 2d 121, 123 (Fla. 2d DCA 1975), *quoted in Cavic v. Grand Bahama Dev. Co.*, 701 F.2d 879, 885 (11th Cir. 1983).

[137] Trial Tr. vol. 1, 104:10-105:13.

R/Funding are inextricably intertwined. Nothing happened at R/Funding without Richert's approval.

Richert also personally directed and participated in the fraud perpetuated on BMO. Richert prepared and executed the 2011 and 2014 Factoring and Security Agreements.[138] He authorized advances to ABL and other clients.[139] He directed Garbrecht to send Wickman the falsified September 22 aging report and was responsible for accepting the $3.89 million "payoff" from BMO fully knowing the amount did not repay R/Funding in full.[140] Richert convinced ABL to execute the 2014 Factoring and Security Agreement but kept all of this information secret from BMO, not recording the UCC Financing Statement until after BMO declared a default against ABL. Richert orchestrated the spot factoring arrangement, forcing ABL into its check kiting scheme that eventually led to the business' demise. Richert was "the captain of the ship, with not only direct oversight but regular operational involvement in every aspect of the business relevant to this fraud, and with full knowledge of the financial benefits reaped from the fraud."[141]

In many ways, ABL was as much a victim of Richert's fraud as BMO. And, although ABL, and not Richert, is the obligor on the loans; this is not a bar. BMO alleges that Defendant caused it damages by inducing it, through fraud, to make the

---

[138] Bart Garbrecht Dep. 42:17-43:15, 61:17-63:4.
[139] Bart Garbrecht Dep. 43:16-23.
[140] Trial Tr. vol. 1, 126:4-25.
[141] *FTC v. Resin (In re Rensin)*, 597 B.R. 177, 183 (Bankr. S.D. Fla. 2018), *aff'd sub nom. Rensin v. FTC*, 604 B.R. 917 (S.D. Fla. 2019).

loan to ABL. Under this theory, BMO may seek "damages for money it lost because of [Defendant's] personal fraud—harm which is compensable under state law."[142] The Court agrees. Richert was the master conductor behind this fraud all designed to maximize payments to R/Funding to the detriment of ABL and of BMO.

### *Richert's Fraudulent Misrepresentations Induced BMO to Lend Monies to ABL*

BMO has proven by a preponderance of the evidence Richert intended to deceive it. Richert lied as needed to convince BMO to lend ABL over $4 million of which $3.89 million was paid to R/Funding. ABL informed Defendant that BMO was limiting the "payoff" amount to $3.89 million,[143] which was about $1.4 million less than what ABL owed.[144] Instead of informing BMO of the deficit or forgiving the balance of ABL's debt, Richert accepted the $3.89 million, knowing he would continue to collect the balance from ABL in an increasingly aggressive way.

In response to a clear email asking whether the $3.89 million would pay R/Funding "in full,"[145] Richert responded, "Yes, we agree to the amount to release UCC and letter of redirection."[146] Defendant never disclosed to anyone at BMO that ABL still owed R/Funding $1.4 million. Nor did Richert tell BMO about the 2014

---

[142] *Associated Mortg. Corp. v. Weaver (In re Weaver)*, 579 B.R. 865, 904 (Bankr. D. Colo. 2018); *cf. Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. 5th DCA 1985) (recognizing that if corporate personnel disclosed some facts, they were under a duty to do so in a nonnegligent or nonfraudulent fashion); *Atl. Sec. Bank v. Adiler S.A.*, 760 So. 2d 258, 259 (Fla. 3d DCA 2000).
[143] Bart Garbrecht Dep. 112:10-20, 132:14-133:12; Dwight Richert Dep. 132:19-25.
[144] Trial Tr. vol. 1, 135:11-16; Pl.'s Ex. 12; Pl.'s Ex. 13; Pl.'s Ex. 14.
[145] Trial Tr. vol. 1, 78:10-79:12; Pl.'s Ex. 16.
[146] Trial Tr. vol. 1, 125:6-127:22; Pl.'s Ex. 16; Pl.'s Ex. 17.

Factoring and Security Agreement executed a week *before* BMO closed the loan with ABL, indicating he intended to continue collecting the undisclosed balance due.[147]

Richert also made affirmative misrepresentations by manipulating the age and other aspects of the September 22 aging report submitted by R/Funding to BMO. The misrepresentations misstated the age of ABL's A/R and were made to induce BMO to increase the loan's borrowing base, inflate the monies lent to ABL and then paid to R/Funding. Richert intentionally altered the report to include paid off accounts, aged accounts that had been "recycled" to appear current, and fake accounts.[148]

Richert had ample motive to convince BMO to loan money to ABL. Because R/Funding kept ABL's financial records, acting as ABL's "back office,"[149] Defendant knew ABL was not collecting its A/R promptly.[150] Defendant knew Danny Letsinger was "flat broke."[151] Richert saw a way to get paid by fraudulently telling BMO rosy "lies" about the quality and currency of ABL's A/R to induce BMO to lend ABL monies—primarily to put BMO's money into R/Funding's coffers.

Although BMO more heavily relied on the September 30 aging report (received directly from ABL), BMO used September 22 aging report (prepared by R/Funding with intended false information) to assess potential collateral.[152] And the September 22 aging report was the basis "with some adjustments" to the September 30 report.[153]

---

[147] Trial Tr. vol. 1, 135:11-21, 137:17-138:6.
[148] *See* Trial Tr. vol. 1, 37:14-51:9.
[149] Dwight Richert Dep. 126:9-17; Trial Tr. vol. 1, 165:16-166:8.
[150] Trial Tr. vol. 1, 47:13-51:9.
[151] Trial Tr. vol. 1, 110:13-112:1.
[152] Trial Tr. vol. 1, 74:7-75:4.
[153] Trial Tr. vol. 1, 61:17-21

Additionally, Danny Letsinger testified that ABL kept track of collections by using "rebate reports or collection reports or reporting from [R/Funding] showing what was being paid, what was being credited off, and then we would use aging reports that we got from them."[154] So, the false information supplied to BMO on the quality of ABL's A/R originated from Richert and R/Funding. And Richert and his staff intentionally gave BMO false information.

Richert also knew he needed to lie to BMO about how much remained due to R/Funding after the initial BMO loan. Richert got an estimate of how much BMO would lend to ABL in September 2014, and he knew this was over $1 million less than ABL's debt to Richert-related companies.[155] Rather than tell BMO about the deficit, Defendant carefully worded a response to BMO's question of whether the $3.89 million would pay him "off in full."[156]

Immediately after getting this large payment from the BMO loan, however, Richert started collecting $27,500 a week from ABL to pay back the $1.4 million deficit at an 18% interest rate.[157] BMO never knew of this side agreement. Nor did ABL's customers because R/Funding told them in a letter it "will no longer be factoring [ABL's] invoices."[158] Yet, Richert simultaneously told its own lender, Platinum Bank, that R/Funding would continue "funding certain deals" and they would continue

---

[154] Danny Letsinger Dep. vol. 1, 59:2-5.
[155] Dwight Richert Dep. 132:19-25.
[156] Trial Tr. vol. 1, 78:10-79:12; Pl.'s Ex. 16.
[157] Trial Tr. vol. 1, 137:13-16; 148:1-6; Bart Garbrecht Dep. 128:1-7, 148:18-24.
[158] Pl.'s Ex. 22.

factoring ABL's A/R when the "season crank[ed] up."[159] Richert continued to use ABL's invoices on the aging reports it sent to Platinum Bank. [160]

Richert tries to explain his deceit to BMO of not disclosing the 2014 Factoring and Security Agreement or the continued factoring relationship between ABL and R/Funding saying, he "didn't know what [BMO] would want to know."[161] Richert is a sophisticated businessman specializing in factoring A/R, a complex, aggressive financial model. He knew that no asset-based lender would permit "business as usual" after extending a loan collateralized by the same A/R that R/Funding was factoring. Richert's testimony is not credible.

"[S]ilence or fraudulent concealment can be a basis for fraud but only where there is a legal or a moral duty to speak or when an inquiry left unanswered would be intentionally misleading."[162] And "[s]ilence or concealment as to a material fact can constitute false pretenses," within the meaning of the dischargeability exception.[163]

BMO rightfully asked ABL and R/Funding about its borrower's (ABL's) loans and obligations. Both ABL and Richert lied to BMO about their recently executed 2014 Factoring and Security Agreement, the $1.4 million deficit, and that ABL and

---

[159] Pl.'s Ex. 25.

[160] Trial Tr. vol. 1, 147:7-25; Pl.'s Ex. 31; Dwight Richert Dep. 34:4-35:16, 180:21-182:23.

[161] Trial Tr. vol. 1, 135:20-21; *see also* Bart Garbrecht Dep. 148:15-17 (stating that he never told Wickman about the 2014 Factoring and Security Agreement because "he didn't ask about it").

[162] *Becks v. Emery-Richardson, Inc.*, No. 86-6866-CIVGONZALEZ, 1990 WL 303548, at *42 (S.D. Fla. Dec. 21, 1990) (citing *United States v. Prudden*, 424 F.2d 1021, 1032 (5th Cir. 1970)).

[163] *Taylor v. Wood (In re Wood)*, 245 F. App'x 916, 918 (11th Cir. 2007) (quoting *FCC Nat'l Bank v. Gilmore (In re Gilmore)*, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998)). "False pretenses differs from false representation or actual fraud only in that: (a) the plaintiff may prove either the defendant's intent to deceive the plaintiff or the defendant's reckless indifference for the truth; and (b) rather than a false representation, the plaintiff may prove the defendant committed 'any intentional fraud or deceit practiced by whatever method in whatever manner.'" *In re Rensin*, 597 B.R. at 185 (quoting *In re Wood*, 245 F. App'x at 918).

R/Funding intended to continue their factoring arrangement, after BMO extended its loan. I specifically find Richert made these misrepresentations with full knowledge of BMO's restrictions barring ABL from continuing to do business with R/Funding,[164] but lied because he was desperate to get the $3.89 million from BMO. And, at least at one point, Richert admitted he knew BMO was not interested in R/Funding staying in as a "subordinated lender."[165] His actions were deceitful and intended to "perpetrat[e] what [was] known to be a cheat or deception."[166]

Richert continued to benefit from BMO's continued lending relationship with ABL. In March 2015, ABL asked BMO for an additional $1 million line of credit from BMO.[167] Richert received most (if not all) of this additional funding. Garbrecht even says: "Perfect, Payable to Richert."[168]

Richert rightfully notes he did cancel R/Funding's security interest in ABL's assets by withdrawing its UCC Financing Statements in October 2014, terminating R/Funding's secured position for a short time. But he renewed this secured position almost immediately after BMO declared a default against ABL in September 2015. He also sued Aaron and Danny Letsinger and the other family guarantors under the hidden 2014 Factoring and Security Agreement stating that "[b]etween June 17, 2015 and August 10, 2015, ABL offered for sale and Richert purchased all of ABL's rights,

---

[164] Trial Tr. vol. 1, 182:21-183:5.
[165] Dwight Richert Dep. 120:12-121:6.
[166] *In re Juravin*, 623 B.R. at 346 (quoting *In re Howard*, 261 B.R. at 517).
[167] Trial Tr. vol. 1, 149:9-15.
[168] Pl.'s Ex. 30.

title and interest in and to ABL's accounts receivable."[169] This demonstrates that, despite his statements to the contrary, by entering into the 2014 Factoring and Security Agreement, Richert intended to preserve a security interest in ABL's collateral and never intended to comply with BMO's Loan Payoff Agreement to "[t]erminate[] and release[] all pledges, guarantees, security interest, liens, mortgages and other encumbrances granted to Richert [Funding]."[170]

I specifically find Richert orchestrated a complex symphonic scheme working behind the scenes and through his staff and the ABL principals with the sole intent to deceive BMO into lending ABL monies, primarily to benefit Richert.[171] The totality of the circumstances show Richert made material misrepresentations to BMO intending to deceive the bank.[172]

### *BMO Relied on Richert's Misrepresentations*

BMO affirmatively relied on Richert's misrepresentations, as proven by the testimony of Wickman and the other BMO employees. BMO relied on Richert's statements about the woefully short $3.89 million "payoff" and was deceived into believing R/Funding would no longer be factoring A/R for ABL.[173] BMO relied on Defendant's statements regarding ABL's outstanding debt in assessing ABL's

---

[169] Trial Tr. vol. 1, 155:4-158:9; Pl.'s Ex. 5; Pl.'s Ex. 6; Pl.'s Ex. 34.

[170] Pl.'s Ex. 18.

[171] *See In re Miller*, 39 F.3d at 305.

[172] The Court also concludes that these facts support a finding that Defendant made false statements concerning material facts that Defendant knew to be false, with the intention that BMO would act upon it. *See Moriber*, 194 So. 3d at 373 (discussing the elements of fraudulent misrepresentation under Florida law).

[173] Trial Tr. vol. 1, 80:17-23, 85:9-19.

indebtedness and whether ABL could repay BMO.[174] Specifically, Wickman testified that, in evaluating whether BMO should extend the loan to ABL, he relied on the statements in the loan payoff agreement and the email from Garbrecht.[175] Additionally, BMO relied on the September 22 aging report to assess potential collateral.[176] BMO relied on the statements of Defendant because R/Funding acted as ABL's "back room" and, based on its factoring relationship with ABL, had control of ABL's cash flow.[177]

BMO also has established *justifiable* reliance by a preponderance of the evidence. The Supreme Court has determined that justified reliance, not merely reasonable reliance, is the appropriate standard of reliance under a § 523(a)(2)(A) false representation claim.[178] Most of the case law discussing justifiable reliance focuses on when a plaintiff has a duty to investigate a defendant's misrepresentation; "put differently, when one in the plaintiff's position should have been alerted to the misrepresentation."[179]

Richert argues that, because BMO rejected ABL's *prior* loan applications, the bank could not have justifiably relied on Richert's statements. Richert argues BMO should have seen "red flags" in ABL's loan application alerting the bank to check for inaccuracies.

---

[174] Trial Tr. vol. 1, 80:1-7.
[175] Trial Tr. vol. 1, 91:21-25.
[176] Trial Tr. vol. 1, 74:7-75:4.
[177] Matthew Chapman Dep. 33:13-35:4, 43:24-44:24.
[178] *Field*, 516 U.S. at 73-75, 116 S. Ct. at 445-46.
[179] *In re Soderstrom*, 524 B.R. at 843.

"Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[180] A creditor is only required to make an investigation beyond the representations given where "under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived."[181] Justifiable reliance does not require that the creditor prove that it acted consistent with ordinary care and prudence.[182] As the Eleventh Circuit has stated:

> It is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.[183]

That BMO might have further investigated and discovered the falseness of Richert's and ABL's representations is not a bar to a fraudulent misrepresentation claim.[184] BMO's representatives testified that the bank followed procedures in the normal course of business, and it rightly assumed its client, ABL, was honest.[185] A bank does not have to test the honesty (or dishonesty) of a loan applicant if no obvious incongruity or ambiguity exists.

---

[180] *Field*, 516 U.S. at 70-71, 116 S. Ct. at 444 (quoting Restatement (Second) of Torts § 545A cmt. b (1976)).

[181] *Id.* at 71, 116 S. Ct. at 444 (quoting W. Prosser, *Law of Torts* § 108, at 718 (4th ed. 1971)).

[182] *Eisinger v. Zito (In re Eisinger)*, 304 B.R. 492, 499 (Bankr. M.D. Fla. 2003) (quoting *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 622 (Bankr. D. Utah 2002)).

[183] *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 283 (11th Cir. 1995) (alteration in original) (alteration omitted) (quoting W. Page Keeton, *Prosser & Keeton on Torts* § 108, at 752 (5th ed. 1984)).

[184] *See Field*, 516 U.S. at 70-71, 116 S. Ct. at 444.

[185] David Maraman Dep. vol. 1, 44:2-15, 170:22-172:3, 404:11-18.

For example, Wickman saw no ambiguity in the carefully worded and false email from R/Funding agreeing to the short $3.89 million payoff. He asked a direct question whether the BMO loan would pay R/Funding in full and got a direct (but false) answer of "yes."[186] BMO had no obligation to investigate further and was justified in relying on this answer.

BMO also justifiably relied on accuracy of the representations in the September 22 aging report prepared by R/Funding.[187] BMO had no obligation to separately "test" the quality of the information. BMO had no duty to ask for further information and had no reason to suspect that the report was anything other than an accurate reflection of ABL's aging report.

The standard in *Field* only requires investigation if a plaintiff knows any facts that would have made the representation false from a cursory glance or that they had discovered something that would have demonstrated the falsity of the statements.[188] Nothing in the record suggests that BMO was on notice of any dishonesty or triggered a need for further investigation into the veracity of the statements made by Richert or ABL. Rather, the evidence supports a conclusion that Richert concocted his scheme deliberately to trick BMO into relying on his misrepresentations, all to benefit R/Funding and himself. BMO's reliance is justified under the circumstances.

### *Damages*

---

[186] Trial Tr. vol. 1, 80:8-23; Pl.'s Ex. 16; *see also* David Maraman Dep. vol. 1, 360:22-362:12.

[187] David Maraman Dep. vol. 2, 750:13-755:4.

[188] *See Ershowsky v. Freedman (In re Freedman)*, 431 B.R. 245, 260-61 (Bankr. S.D. Fla. 2010), *aff'd*, 427 F. App'x 813 (11th Cir. 2011).

Having concluded Richert intentionally misled BMO to extend the loan to ABL, the focus turns to damages. Under § 523(a)(2)(A) of the Bankruptcy Code and Florida law, Richert is liable for BMO's pecuniary loss.[189]

"The harm suffered by the victim of an intentional misrepresentation ordinarily (a) is the necessary consequence of the victim's reliance on the misrepresentation and (b) is commensurate with some benefit obtained by the person making the misrepresentation."[190] Florida has two standards for the measurement of damages in an action for fraudulent misrepresentation: the "benefit of the bargain" rule and the "out-of-pocket" rule; "[e]ither may be used to do justice as the circumstances demand."[191]

However, looking at the Restatement (Second) of Torts, by analogy, which follows Florida law,[192] a plaintiff is limited to out-of-pocket damages when "the plaintiff has not entered into any transaction with the defendant but has suffered his pecuniary loss through reliance upon the misrepresentation in dealing with a third person."[193]

> [W]hen the financial position of a third person is misrepresented for the purpose of inducing the recipient to extend credit to him . . . the loss for which the plaintiff can recover is that suffered because of the third person's inability to meet the credit extended to him. If the third person pays nothing, the loss recoverable is the entire amount of the credit

---

[189] *See Generac Power Sys., Inc. v. Dato (In re Dato)*, 410 B.R. 106, 111 (Bankr. S.D. Fla. 2009) (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997); Restatement (Second) of Torts § 525); *see also* Restatement (Second) of Torts § 549.

[190] *Southstar Equity, LLC v. Lai Chau*, 998 So. 2d 625, 633 n.2 (Fla. 2d DCA 2008).

[191] *Nordyne, Inc. v. Fla. Mobile Home Supply, Inc.*, 625 So. 2d 1283, 1286 (Fla. 1st DCA 1993).

[192] *Id.*

[193] Restatement (Second) of Torts § 549 cmt. g.

extended. If the third person pays in part, the loss recoverable is the residue remaining unpaid by him.[194]

"In applying this measure of damages, courts have awarded the amount loaned to the third party, minus any payments received on the loan, but refused to award interest at the rate provided in the loan."[195] This is exactly the case here.

BMO has proven that it was damaged by Richert's misrepresentations—BMO would not have lent ABL *any* monies without Richert's deceits. "A plaintiff, as the fourth and final element, must establish a causal link between the debtor's misrepresentation and the resulting loss sustained by the plaintiff."[196] BMO specifically and justifiably relied on Richert's statements in the loan payoff agreement and the email from Garbrecht confirming the loan would pay R/Funding in full.[197]

Because BMO would not have lent ABL any monies without these misrepresentations, BMO initially was damaged by $3.89 million, the amount BMO lent to ABL under the First Credit Agreement directly paid to R/Funding. BMO's damages increased when, due to Richert's misrepresentations that R/Funding was no longer factoring ABL's A/R under the Second Security and Factoring Agreement,

---

[194] Restatement (Second) of Torts § 549 cmt. a.

[195] *In re Weaver*, 579 B.R. at 906 (citing *First Nat'l Bank of Durant v. Trans Terra Corp. Int'l*, 142 F.3d 802, 811 n.28 (5th Cir. 1999); *Citizens State Bank v. Shearson Lehman Bros., Inc.*, 874 F. Supp. 307, 309 (D. Kan. 1994)) "Awarding the contractual rate of interest would give the lender the benefit of its bargain rather than its out-of-pocket loss.").

[196] *Phillips, Mille & Costabile Co. v. Shusteric (In re Shusteric)*, 380 B.R. 58, 66 (Bankr. M.D. Fla. 2007) (citing *Fugate v. Stevens (In re Stevens)*, No. 8:02-ap-589-PMG, 2003 Bankr. LEXIS 1950, at *18-19 (Bankr. M.D. Fla. Sept. 12, 2003)).

[197] Trial Tr. vol. 1, 91:21-25.

BMO lent an extra $1 million seasonal line of credit to ABL.[198] R/Funding received 100% of this payment also. Richert, acting out of self-interest, fraudulently induced BMO to lend ABL the entire $4.89 million, which went directly to R/Funding.

BMO may have its out-of-pocket loss measured as the amount loaned less any amount paid on that debt. The principal amount remaining under the First Credit Agreement (as of the date BMO first sought repayment from Defendant) is $3,742,403.67; the principal amount remaining under the Second Credit Agreement is $1,000,000.00. Therefore, the total damages incurred by BMO because of Richert's fraud is $4,742,403.67.

BMO asks for a judgment against Richert for the $12,168,589.45 BMO Judgment against ABL. I reject this argument finding the BMO Judgment is not relevant to determining the damages BMO suffered due to Richert's fraud.[199]

BMO also is not entitled to recover interest accruing under the First and Second Credit Agreements. BMO had no agreement directly with R/Funding or Richert. Therefore, BMO cannot collect interest accruing under these credit agreements

---

[198] As Maraman, a representative for BMO testified, BMO "would never have made the loan, the million dollar loan, had [it] known that those proceeds were going to be going outside of ABL and our organization." David Maraman Dep. vol. 2, 603:4-8.

[199] First, Defendant is not liable for the indemnification for the PACA claims. *See Dade Cty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 642 (Fla. 1999) (recognizing Florida courts require a special relationship between the parties for common law indemnification to exist). Second, because Defendant's liability to BMO is established in torts, he is not liable for the indemnification and reimbursement of BMO's attorney's fees and expenses. Restatement (Second) of Torts: Damages § 914 ("The damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation."). Third, as to ABL's overdrafts, these overdrafts were done on ABL's commercial account with BMO and were separate and apart from the loan. Because there is not a causal link between Defendant's misrepresentations and these over-advances, Defendant is not liable.

because this would employ the "benefit of the bargain" measure of damages. And

Defendant was not a party to that bargain.[200]

BMO, however, is awarded prejudgment interest at the applicable statutory

rate.[201]

> A determination of whether to award any prejudgment interest requires
> consideration of equities including such factors as the merits of the
> underlying action, whether the amount of defendant's liability could have
> been determined at the outset, the causes of any delays in bringing the
> case to resolution, and the avoidance of punitive measures.[202]

Where there is no controlling federal statute, "the choice of a rate at which to set the

amount of prejudgment interest is . . . within the discretion of a federal court."[203] Under

Florida law, "[w]hen a verdict liquidates damages on a plaintiff's out-of-pocket

pecuniary losses, the plaintiff is entitled to prejudgment interest at the statutory rate

from the date of such loss."[204] Here, because it is unclear when BMO first demanded

---

[200] *See In re Weaver*, 579 B.R. at 906 (citing *First Nat'l Bank of Durant*, 142 F.3d at 811 n.28; *Citizens State Bank*, 874 F. Supp. at 309).

[201] The general rule under Florida law is that "a plaintiff is entitled to prejudgment interest as a matter of law." *SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1320 (11th Cir. 2007).

[202] *Nordberg v. ARAB Banking Corp. (In re Chase & Sanborn Corp.)*, 127 B.R. 903, 923-24 (Bankr. S.D. Fla. 1991) (citing *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176, 109 S. Ct. 987, 991 (1989); *Blau v. Lehman*, 368 U.S. 403, 414, 82 S. Ct. 451, 457 (1962); *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987); *Parker Towing Co. v. Yazoo River Towing, Inc.*, 794 F.2d 591, 594 (11th Cir. 1986); *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1281 (8th Cir. 1988); *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd.)*, 93 B.R. 333, 341-42 (E.D. Pa. 1988)).

[203] *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.)*, 408 F.3d 689, 710 (11th Cir. 2005).

[204] *Greenberg v. Grossman*, 683 So. 2d 156, 157 (Fla. 3d DCA 1996) (citing *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212 (Fla. 1985); *Underhill Fancy Veal, Inc. v. Padot*, 677 So. 2d 1378 (Fla. 1st DCA 1996); *Machado v. Foreign Trade, Inc.*, 478 So. 2d 405 (Fla. 3d DCA 1985), *disapproved on other grounds*, *Cheek v. McGowan Elec. Supply Co.*, 511 So. 2d 977 (Fla. 1987)).

payment from ABL, prejudgment interest will accrue from the date BMO filed the lawsuit seeking payment from Defendant,[205] November 6, 2015.[206]

Prejudgment interest is calculated using Florida's interest rate effective at the time of entitlement[207] (4.91% on November 6, 2015) applied against the assessed damages of $4,742,403.67. The daily interest rate is .01341530%.[208] The number of days between November 6, 2015, and July 21, 2021 (the date of this judgment) is 2,085 days. Multiplying $4,742,403.67 by the daily interest rate (as a decimal) of .0001341530 is $636.21.[209] The daily interest multiplied by 2,085 days is $1,326,493.01.[210] That amount ($1,326,493.01) added to the base damages ($4,742,403.67) totals $6,068,896.68.

Further, this Court awards post-judgment interest on the total judgment amount of $6,068,896.68 from the date the judgment is rendered until the date the judgment is satisfied. For post-judgment interest, federal law governs.[211] The federal post-judgment interest rate is governed by 28 U.S.C. § 1961(a), which sets the rate at the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of the judgment. According to the Federal Reserve Statistical Release H.15, the

---

[205] *See Vellef v. Control-O-Fax Corp.*, 682 So. 2d 1243, 1244 (Fla. 5th DCA 1996).
[206] Compl., *BMO Harris Bank, N.A. v. Richert Funding, LLC*, No. 1:15-cv-03886-MLB (N.D. Ga. Nov. 6, 2015), ECF No. 1.
[207] *See IberiaBank v. Coconut 41, LLC*, 984 F. Supp. 2d 1283, 1300 (M.D. Fla. 2013), *aff'd*, 589 F. App'x 479 (11th Cir. 2014) (discussing framework for prejudgment interest in Florida).
[208] https://www.myfloridacfo.com/Division/AA/LocalGovernments/Historical.htm (last visited July 20, 2021).
[209] The full number is $636.20767954151.
[210] The full number is $1,326,493.011844048.
[211] *See Boston Old Colony Ins. Co. v. Tiner Assocs.*, 288 F.3d 222, 234 (5th Cir. 2002).

average 1-year constant maturity Treasury yield for the week ending July 16, 2021 was 0.08%.[212] Post-judgment interest shall accrue at the statutory rate of 0.08% from the date of judgment.

### *Conclusion*

BMO has proven the elements of § 523(a)(2)(A) by a preponderance of the evidence. Defendant, Dwight Richert, is liable to BMO for a non-dischargeable fraud judgment for $6,068,896.68, plus post-judgment interest. A separate Final Judgment shall be entered contemporaneous with this Memorandum Opinion.

### ###

Attorney Michael Nardella will serve a copy of this order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the order.

---

[212] https://www.federalreserve.gov/releases/h15/ (last visited July 20, 2021).